**REGAL CINEMAS, INC., Plaintiff–Appellee/Cross–Appellant,**

v.

**W & M PROPERTIES; John R. McGill; Developers Diversified Realty Corporation, Defendants–Appellants/Cross–Appellees.**

Nos. 02–3450, 02–3514.

United States Court of Appeals, Sixth Circuit.

Jan. 27, 2004.

Mark I. Wallach, Kimberly M. Oreh, Calfee, Halter & Griswold, Cleveland, OH, Charles A. Wagner, III, Herbert S. Sanger, Jr., General Counsel, W. Turner Boone, Wagner, Myers & Sanger, Knoxville, TN, for Plaintiff–Appellee/Cross–Appellant.

Marvin L. Karp, Ulmer & Berne, Cleveland, OH, for Defendants–Appellants/Cross–Appellees.

Before COLE and CLAY, Circuit Judges; and QUIST, District Judge.*

## OPINION

COLE, Circuit Judge.

Defendants W & M Properties, Developers Diversified, and John R. McGill (collectively, defendants) appeal the district court's denial of their motion for judgment as a matter of law at the close of a jury trial. Defendants argue that they were entitled to judgment as a matter of law because plaintiff Regal Cinemas, Inc. failed to establish two elements of fraud under Ohio law: justifiable reliance and resulting damages. Further, defendants argue that the issue of punitive damages should not have been submitted to the jury. Regal Cinemas, Inc. cross-appeals the district court's denial of attorney fees and costs. For the following reasons, the judgment of the district court is AFFIRMED in part. With respect to attor-

* The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

ney fees and costs, the judgment is VACATED and REMANDED to the district court.

## I. Background

This lawsuit arose out of a real estate transaction under which defendants[1] were to build a theater for Regal Cinemas, Inc. ("Regal") at Macedonia Commons, a shopping center developed and owned by the defendants in Macedonia, Ohio. The district court granted the defendants' motion for summary judgment, and a panel of this Court reversed that decision and remanded the case to the district court for trial. At the conclusion of the trial, the jury found for Regal on Regal's fraud claim, awarding actual damages in the amount of $5,000,000.00, punitive damages in the amount of $1,000,000.00 against each of the defendants, and attorney fees and costs.

At trial, Regal alleged a series of misrepresentations by defendants. The initial agreement between Regal and W & M Properties ("W & M") provided for a theater to be built on the west side of a road that ran through the complex. Defendants were to obtain the necessary government approvals, and a contingency clause was included in the agreement allowing either party to terminate if defendants had not obtained the approvals by a specified date. That date was never filled in on the agreement, nor did the parties agree to a date.

According to Regal, W & M never sought the necessary governmental approvals for the theater. Regal presented evidence at trial that W & M was negotiating with Kohl's Department Store for the use of Regal's site on the west side of the road by April 1994, and by June 1994 defendants had reached an agreement with Kohl's to lease that site to it. Regal also presented evidence at trial that, at this same time, the defendants were providing false and misleading information to Regal regarding the cause of the delays. For example, Keith R. Thompson, Senior Vice President at Regal, testified that in May of 1994, McGill informed him that the delays were being caused by "unsuitable soils" on the west site and told him that construction would start in mid-summer. In June 1994, another employee of the defendants told Thompson that the "unsuitable soils" would be removed by July 4, 1994, and that approval of the final theater site was on the Macedonia Planning Commission's August 1994 agenda.

Regal threatened to cancel the agreement as a result of the delays. In response, McGill met with Regal's Thompson. McGill proposed an alternate site on the east side of the road. McGill touted the virtues of the east site—better access and freeway visibility—but did not inform Thompson about any differences in the permitting requirements for that site. Thompson testified at trial that McGill told him that the east site collected storm water run-off from I–271 but that it was not a true wetland. In fact, W & M had previously developed the east site as a wetland so that the Army Corps of Engineers would grant them a permit in 1991 to fill in the wetlands that then existed on the west side of the road. Later, having decided that they wished to develop the wetlands they had created on the east side as well,

---

1. John R. McGill and Burt L. Wolstein were the sole partners of W & M Properties, which developed shopping centers under the trade name Developers Diversified until 1993. In 1993, Developers Diversified Realty Corporation ("DD") became a publicly traded company, of which McGill was vice president and Wolstein was chairman of the board. When DD went public, some employees of W & M were transferred to DD, and the operating shopping centers owned by W & M were also transferred to DD. McGill, W & M, and DD are the appellants in this case. The verdict against Wolstein was vacated by the district court pursuant to a Rule 50 motion, and that decision is not challenged here.

defendants hired HzW Environmental Services in June 1994 to obtain the necessary wetland permit from the Army Corps of Engineers.[2]

Regal, unaware of these issues, agreed to the move, and McGill proposed to follow up with a site plan and a time line for construction. On November 10, 1994, McGill sent a revised site plan that showed the theater and a Target store on the east side of the boulevard; the Kohl's store appeared on the west site. On December 14, 1994, McGill sent Thompson a proposed First Amended Lease, which reflected the change in location, a change in size, and added the date June 30, 1995, to the contingency clause. A letter accompanied the proposed amendment containing a plan of action:

As a followup to our phone conversations of last week, please find enclosed a Lease Amendment pertinent to this location which modifies the building size and location. Furthermore, our current schedule for this development is as follows:

— On or about 1/15/95 we will have a meeting with the Corps of Engineers and Ohio EPA to finalize our wetland mitigation plan and permit.
— We expect the wetland permit to be in hand by 4/15/95, or before.
— We will commence architectural drawings no later than 2/1/95 with completion by 3/15/95.
— We will put the project out to bid on 3/15/95 for a 4/15/95 bid date.
— The project will be let on 5/1/95 with a 10/1/95 turnover date.

Keith, we will be commencing, during the month of December, our site plan approval process with the city and expect that to be completed no later than 2/1/95. I will do everything in my power to make certain these dates are adhered to so that we can put this behind us. J.A. 571.

Thompson testified that the letter allayed Regal's scheduling concerns at that time. But Regal argued at trial, and defendants do not challenge here, that this schedule was impossible to meet and that defendants knew it was impossible to meet. Regal executed the First Amended Lease on February 27, 1995; W & M executed it on March 17, 1995. All necessary government approvals were not obtained by June 30, 1995, and W & M sent a letter on July 3, 1995, stating that W & M was exercising its right to terminate under the lease's contingency clause.

The parties also had dealings regarding another theater for which DD was the lessor, in Tiffin. Ohio, which Regal had acquired in April of 1994. DD approached Regal about expanding that theater, as the previous owner of the theater had been discussing expansion with DD. On September 7, 1994, Regal and DD worked out the general terms of an expansion for the Tiffin theater. When, by January 31, 1995, Regal had not executed either this agreement or the First Amended Lease for Macedonia, proposed on December 14, 1994, DD sent a letter to Regal stating that "both the Tiffin and Macedonia theater deals will be viewed by Developers Diversified as null and void if the respective documents are not executed and returned to me on or before February 28, 1995." On either February 7, 1995, or February 27, 1995, Regal sent the executed First Amended Lease for the Macedonia theater to W & M. W & M executed and returned that lease on March 17, 1995.

---

**2.** HzW proposed that some other land owned by W & M in Twinsburg, Ohio, be converted to wetlands in place of the wetlands that defendants developed on the east side of Macedonia Commons Boulevard pursuant to their previous agreement with the Army Corps of Engineers.

On March 3, 1995, Regal sent a version of the Tiffin lease with proposed changes. On April 4, 1995, Regal sent executed versions of the Tiffin lease that contained a provision that allowed the Tiffin lease to be terminated by either party if either party invoked the contingency clause of the Macedonia lease or the Macedonia lease premises were not delivered by February 28, 1996. DD refused to sign this lease, and the parties abandoned the plan to expand Tiffin. DD's executive committee directed W & M to terminate the Macedonia lease because DD was dissatisfied regarding the failure of the Tiffin expansion.

## II.  Judgment as a Matter of Law

On appeal, defendants challenge the district court's denial of their Rule 50 motions for judgment as a matter of law with regard to only two of the elements of fraud under Ohio law: justifiable reliance and resulting injury. We review *de novo* the district court's denial of a Rule 50 motion for judgment as a matter of law, evaluating the evidence in the light most favorable to the party against whom the motion is made, and giving that party the benefit of all reasonable inferences. *Chandler v. Specialty Tires of America (Tennessee). Inc.*, 283 F.3d 818, 824 (6th Cir.2002).

The district court denied their motions on the erroneous grounds that it was bound by the Sixth Circuit's earlier decision in this case reversing the grant of summary judgment to defendants. *Regal Cinemas, Inc. v. W & M Properties*, 234 F.3d 1269, 2000 WL 1597914 (6th Cir. Oct.17, 2000). Although the standard for granting judgment as a matter of law mirrors that for granting summary judgment, they are applied at different times during the litigation. On a Rule 50 motion, the district court must determine whether the evidence presented at trial, which may or may not closely resemble the evidence presented at the summary judgment stage, creates a genuine issue of material fact. A district court is simply not bound by a denial of summary judgment, whether it be its own or ours, on the ultimate issue of whether a Rule 50 motion should be granted. Notwithstanding its misunderstanding of the procedural posture, we affirm the district court's decision for the reasons stated below.

### A.  Justifiable Reliance

■ Defendants argue that the evidence, viewed most favorably for Regal, cannot establish justifiable reliance. First, defendants assert that we must look solely to direct evidence regarding whether Regal actually relied on the misrepresented schedule at the moment that it executed the revised lease. Yet, this case involved multiple misrepresentations as well as multiple occasions upon which Regal acted or refrained from acting in reliance upon them. Further, even considering just the issue of whether Regal's signing of the amended lease was in reliance on the misrepresentation, a reasonable jury is certainly permitted to consider evidence of previous reliance—for example, evidence of reliance at the time an agreement was reached in principle—and reasonably infer that the considerations that led a party to agree to a deal in principle will carry through to the execution of the agreement. While the trier of fact should consider evidence regarding whether reliance was *still* reasonable at the time the party acted, it is certainly proper to examine evidence of reliance from previous dates to make a determination regarding whether reliance occurred and was reasonable as of the relevant date that the parties acted upon it. And in the Rule 50 motion context, we must draw this inference in Regal's favor. In any event, there is direct evidence of reliance as of the actual execution. Defendants ask us to disregard the trial testimony of Thompson, a senior vice

president at Regal who testified on the issue of reliance, based on the fact that his testimony seemed "hesitant" and contained the phrase "I believe" before the answer. But whether such a verbal tick undermined Thompson's credibility was a question for the jury, which apparently concluded that it did not.

Defendants also point to additional testimony from Thompson that he was skeptical prior to the execution about whether defendants were going to follow through with the lease. But examination of the trial transcript reveals that the testimony provides little support for defendants. Part of Thompson's testimony relates to his opinion after receiving a May 10, 1995, fax—well after the February 27, 1995, execution of the lease amendment. J.A. 872–73. Nor does the remaining testimony cited by defendants provide sufficient support: Thompson at first agreed with a lawyer's question that contained the language about being "skeptical" but he later backpedaled from that language. Defendants would paint this as dissembling, but the jury might reasonably attribute the language to the lawyer and not to Thompson. Thus, a jury was not required to conclude that Thompson "admitted" that he was "skeptical" rather than just "concerned"; it could alternatively have concluded that this was a case of the lawyer trying to put words into Thompson's mouth. Nor does this testimony inevitably lead to the conclusion that Regal did not rely on the representations from defendants: A jury might instead have concluded that, despite concerns about whether W & M would follow through, Regal signed the agreement *because* of W & M's misrepresentations.

Alternatively, the jury could have concluded that even if Thompson was skeptical, it was a result of his concern that defendants were going to hamstring the Macedonia lease unless things went through with the Tiffin lease—a concern that led to putting a provision in the Tiffin lease to prevent exactly that from happening. Under this theory. Thompson's skepticism was not related to the schedule for the Macedonia lease proper but to what defendants' conduct might be as a result of the Tiffin negotiations. Given that on a Rule 50 motion we are to construe the evidence, with all reasonable inferences, in favor of the nonmovant, the evidence identified by defendants on appeal does not prevent a reasonable trier of fact from concluding that Regal did rely and was justified in relying upon the misrepresentations.

## B. *Resulting Injury*

■ Defendants offer several arguments why Regal failed to establish "resulting injury" from the misrepresentations. First, defendants argue that the evidence, viewed most favorably for Regal, cannot establish resulting injury because defendant's misrepresentations were not the proximate cause of Regal's damages. Rather, defendants contend that Regal itself caused the failure of the Macedonia deal by failing to cooperate on the Tiffin theater expansion, which in turn motivated defendants to invoke the Macedonia contingency clause. Defendants' argument, presented fully to the jury, is in essence that Regal tried to outmaneuver them by leading them on regarding the Tiffin lease, and that this conduct was somehow underhanded. Since Regal had no obligation to expand Tiffin at all and because Regal had no particular reason to switch sites at Macedonia—other than W & M's misrepresentations about soil quality—it is difficult to understand the gravamen of this argument. Further, it is based entirely on inferences from events that the jury was free to make or reject at will. Here, where we are to draw all inferences in a light most favorable to the nonmovant, we

are prohibited from drawing them as defendants desire.

Even if defendants did terminate the lease because of Tiffin, the fraud is still the proximate cause of the damages. The termination clause allowed a party to terminate the agreement only if all necessary governmental approvals had not been received by June 30, 1995. It was defendants' misrepresentations regarding the schedule on which they would obtain the permits that caused Regal to enter into the revised lease containing this termination clause with that June 30, 1995, date for obtaining those permits. Any alleged conduct by Regal did not so break the chain of causation as to qualify as an intervening cause. Defendants were only in a position to invoke this clause—for whatever reason—because of their misrepresentations. And, indeed, under Ohio law, an "intervening cause" defense is unavailable in fraud cases. *Doyle v. Fairfield Mach. Co., Inc.*, 120 Ohio App.3d 192, 697 N.E.2d 667, 679 (Ohio App.1997) ("In a case based upon an intentional tort such as fraud or tortious interference, however, where the intervening act complained of is the act of the plaintiff, an analysis of intervening cause is tantamount to a comparative negligence claim, which is no defense to an intentional tort.").

Second, defendants argue that Regal failed to establish any damages because it was no worse off due to the fraud. *See Columbia Gas Transmission Crop. v. Orgle*, 172 F.3d 47, 1998 WL 879583 (6th Cir. Nov.25, 1998). The facts belie this contention. Regal presented evidence at trial suggesting that, had defendants sought approval from the planning commission, it would have been granted, and the theater on the west site would thus have had all necessary government approvals. This evidence included the May 2, 1994, approval of an April 18, 1994, proposal to the planning commission for a restaurant on the west site and evidence from the planning commission meeting where defendants presented the proposed Kohl's store that included an expressed preference for the theater on the west site. Due to defendants' misrepresentations, Regal agreed to move from property that could have been developed immediately—in fact, the only reason that development had not yet begun as of that time was due to defendants *other* misrepresentations about quality of soil problems—to property where development could not begin for a significant time due to serious permitting problems, the very subject of the misrepresentations.

Third, defendants argue that, had the fraud not resulted in an amended lease, one or the other party probably would have invoked the contingency clause anyway, with the result that Regal would be in the same position it was in after the fraud—that is, with no theater in Macedonia. All this is far too speculative to establish that Regal is in no worse a position. Further, had events proceeded down that hypothetical alternate course, it is entirely likely—given the record we have—that Regal would have *different* breach of contract or fraud claims.

■ Fourth, defendants argue that Regal was required to present evidence of damages separate from the damages that it claimed to have suffered due to the breach of the lease claim that the jury rejected. Under Ohio law, a "fraud damages [must] be limited to the injury actually arising from the fraud. The tort injury must be unique and separate from any injury resulting from a breach of contract." *Medical Billing, Inc. v. Medical Mgmt. Sciences, Inc.*, 212 F.3d 332, 338 (6th Cir. 2000). The jury found that there was no breach of contract in this case. Since there was no breach of contract, there is no concern that the fraud damages duplicate the damages resulting from a breach.

Defendants also seek to apply the proposition that "[a] party cannot recover under theories of both fraud and negligence *based upon the same course of conduct.*" *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*, 115 Ohio App.3d 137, 684 N.E.2d 1261, 1269 (Ohio App.1996) (emphasis added). Regal has not asked us to turn a mere breach of contract into a tort claim: rather, the fraud claim relates to distinct acts, especially since the jury found that there was no breach of contract in this case. Defendants' argument that, every time a party claims both breach of contract and fraud, the party cannot recover fraud damages that duplicate the damages that it claimed under breach of contract even where it has been determined there was no breach of contract, is flatly unreasonable. Not only does Ohio law not support this proposition, but reading it that way would result in a penalty for arguing in the alternative.

■ Finally, defendants argue that Regal did not prove the amount of lost profits with "reasonable certainty." Although it is undisputed that a party must prove the *existence* of lost profits to a reasonable certainty, the parties dispute whether a party must prove the *amount* of lost profits to a reasonable certainty in a tort action under Ohio law. Ohio courts are split on this issue. *Compare Hacker v. Mail,* 1996 WL 346628, at *4–5 (Ohio App. June 24, 1996) (concluding that only existence need be proven with reasonable certainty; amount may be established by presenting a reliable methodology upon which the trier of fact may reasonably estimate), *with Ace Vending Co. v. Davidson,* 8 Ohio App.3d 328, 457 N.E.2d 341, 343 (Ohio App.1982) (requiring existence and amount be proven to a reasonable certainty, citing a contract case); *see also Brookside Ambulance, Inc. v. Walker Ambulance Serv.,* 112 Ohio App.3d 150, 678 N.E.2d 248, 253– 54 (Ohio App.1996) (requiring reasonable certainty as to both but noting that "courts have generally required greater certainty in proof of damages for breach of contract than for tort").

We need not resolve the issue, however, since Regal presented sufficient evidence to satisfy even the higher standard. In this context. "[a] fact is 'reasonably certain' if it is probable or more likely than not." *Bobb Forest Products. Inc v. Morback Indus., Inc.,* 151 Ohio App.3d 63, 783 N.E.2d 560, 579–80 (Ohio App.2002). Further, "evidence of lost future profits as an item of compensatory damages need only be reasonable, not specific." *AGF. Inc. v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 640 (Ohio 1990).

Regal presented two damages experts— Robert Greenwald and James Barwick— who provided testimony on Regal's lost profits under two different theories of calculation. Both experts calculated lost profits using models based on the actual profits acquired by the theater that was ultimately built at Macedonia Commons. The experts adjusted these profits statistically, based on differences between Regal's proposed theater and the theater that was ultimately built, such as size of the theater and the fact that the theater ultimately built did not open until 1999. Greenwald estimated damages on the original ten-year lease term plus two ten-year renewals. Barwick estimated damages using the original term plus one ten-year renewal. Barwick did not use a growth factor, while Greenwald used a 3% growth factor. The nature of the two experts' methodologies was presented to the jury, and defendants had the opportunity to and did in fact challenge the computations used by the experts before the jury in numerous ways. Defendants argued to the jury, inter alia, that the experts were incorrectly accounting for the difference in theater size and were neglecting the effect of stadium-style

seating, and that Barwick was overestimating the proceeds from 1995 through 1998.

Regal's evidence of damages was sufficient to allow the jury to find the amount of lost profits to a reasonable certainty. The ultimate purpose of requiring a party to prove both the existence and amount of lost profits is to avoid claims that are too remote and speculative. *See Bobb*, 783 N.E.2d at 579. Defendants have not argued that Regal—since 1998, the largest motion picture exhibitor in the world—would have had difficulty establishing a profitable theater at Macedonia Commons, or that the estimated profits were wildly afield. Instead, the parties quibbled—appropriately so—over the fine points of methodology before the jury.

Defendants also contend that expert Greenwald's testimony was insufficient to establish lost profits because he lacked prior experience with movie theaters. Defendants rely on AGF, contending that it establishes a per se rule that an expert on lost profits must have previous experience in that field. *AGF*, 555 N.E.2d at 640. But the passage in *AGF* put forward by defendants may be read as a mere rejection of the particular expert in that case. Indeed, subsequent Ohio appellate courts applying *AGF* have not taken it to create such a per se rule. *See, e.g., Bobb* 783 N.E.2d at 579–81 (upholding lost profits based on testimony of an accountant without any particular ties to the industry). In the present case. Greenwald specialized in damages analysis such as the one performed in this case. He is a certified public accountant, a certified business appraiser, a shareholder and director of litigation support group of an accounting firm, and he has offered testimony in at least fifty court cases. Further, Greenwald did not testify alone: Barwick was offered as an expert in the movie theater industry. Greenwald's alleged lack of experience does not make Regal's evidence

too uncertain. The denial of the Rule 50 motions was appropriate.

### III. Expert Testimony

Defendants argue that the district court's denial of their motions to strike the expert testimony of Barwick and Greenwald was prejudicial error. Defendants make no independent argument in this section of their brief but merely refer us to the reasons they listed—discussed above—in the context of the denial of their motion for judgment as a matter of law. The standard, however, is different. Under Federal Rule of Evidence 702, "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." We review the district court's rulings regarding the admission of expert witness testimony under Rule 702 for abuse of discretion. *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 544 (6th Cir.2000).

None of the alleged deficiencies discussed above regarding this testimony are of the type that would lead us to the conclusion that the district court abused its discretion when it concluded that Barwick and Greenwald were qualified experts reliably applying reliable principles and methods to sufficient facts or data. Nor does Greenwald's mere lack of previous experience with the movie exhibition industry render his financial analysis inadmissible under Rule 702.

### IV. Punitive Damages

Defendants argue that the evidence is insufficient to support punitive damages. In order to qualify for punitive damages in a fraud case under Ohio law, a plaintiff must demonstrate either that the fraud

was the product of malice or ill will, or that it was particularly gross or egregious. *Charles R. Combs Trucking. Inc. v. Int'l Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883, 885 (Ohio 1984). Plaintiff's ultimate burden is to prove its entitlement to punitive damages by clear and convincing evidence. *Leahey*, 219 F.3d at 545.

Defendants claim that Regal had to show "actual malice," but that simply is not the law of Ohio in a fraud case. As quoted above, plaintiff "must *either* show that the fraud is aggravated by the existence of malice or ill will, *or must demonstrate* that the wrongdoing is particularly gross or egregious." *Combs*, 466 N.E.2d at 885 (emphasis added). In this case, drawing all inferences in a light most favorable to the non-moving party, the jury could have concluded that defendants' conduct amounted to gross or egregious fraud. Although much of the discussion in this case focused around the December 14, 1994, letter, the evidence, viewed in the light most favorable to the nonmovant, includes or implies several misrepresentations, including the misrepresentations about "unsuitable soils" while W & M was negotiating with Kohl's over the west site, misrepresentations and omissions regarding the permits required and wetland status of the east site, and serious misrepresentations regarding the timeline for construction. A continuous course of fraudulent conduct may be gross or egregious fraud. *See Combs*, 466 N.E.2d at 888. Because there was sufficient evidence of gross or egregious fraud to go to the jury on the issue of punitive damages, the district court's denial of judgment as a matter of law on punitive damages was proper.

## V. Attorney Fees and Costs

Regal argues, in its cross-appeal, that the district court abused its discretion when it denied Regal the attorney fees and costs separately awarded by the jury. The district court found that the amount of the punitive damages awarded by the jury adequately covered attorney fees and costs, as well as served the purposes of punitive damages, and thus declined to award the attorney fees and costs awarded by the jury. Under Ohio law, a trial court may decline to award such fees, even if a jury has determined that such fees should be awarded, if the punitive damages awarded are adequate both to compensate the plaintiff for his attorney fees and to fulfill to punitive and deterrent purpose of the exemplary damages awarded. *Digital & Analog Design Corp. v. North Supply Co.*, 63 Ohio St.3d 657, 590 N.E.2d 737, 743 (Ohio 1992). The district court concluded that $3,000,000 in punitive damages ($1,000,000 each against W & M. DD. and John R. McGill) was sufficient to serve its punitive and deterrent purposes and to compensate Regal for the $434,033.26 in attorney fees, costs, and litigation expenses. Since different analyses apply to the $416,435.07 in attorney fees and to the $17,598.19 in costs, we will treat them separately.

The district court provided no reasons for reaching its conclusion that the punitive damage award was sufficient to cover attorney fees. Regal argues that this was an abuse of discretion because the district court "never considered the financial statue of McGill or W & M and ignored the fact that DD's net worth as of June 30, 2001, was $1,024,583,000.00 and its net income for the 6–month period 1/1/01 to 6/30/01 was $51,823,000.00." Appellee's Brief at 56. Financial information on McGill and W & M was absent from the record since the district court denied Regal's motion to compel such information from McGill and W & M. J.A. 1027–29. On this basis, Regal argues that it was impossible for the district court to decide non-arbitrarily whether the punitive damage award was sufficient to have the appropriate punitive and deterrent effect on

McGill and W & M, and that it is unreasonable to think that an amount less than the $1,000,000 specifically awarded against DD would still serve the punitive and deterrent purpose against a company of such significant means.

Although the amount of attorney fees awarded lies soundly within the trial court's discretion, such an exercise of discretion cannot be exercised arbitrarily. *Youn v. Track, Inc.*, 324 F.3d 409, 420 (6th Cir.2003). Here, where the district court had no information on the financial status of two of the defendants, we are left with no choice but to conclude that the district court acted arbitrarily in determining that no fees should be awarded on the basis that the punitive damage award, reduced by fees, would still serve its punitive and deterrent purpose. *Cf. Jackson v. Law Firm of O'Hara, Ruberg, Osborne & Taylor*, 875 F.2d 1224, 1230 (6th Cir.1989) (finding failure to consider ability to pay Rule 11 sanctions an abuse of discretion). A reasoned weighing of the punitive and deterrent value of the reduced punitive damage awards cannot be had without the relevant information regarding the financial status of the parties to be punished and deterred.

The district court effectively eliminated costs from the damages award in the same manner that it eliminated attorney fees. Regal claimed $17,598.19 as recoverable costs under 28 U.S.C. § 1920, but the district court merely included costs with the attorney fees in the amount that it decided the punitive damage would cover. However, the *Digital* holding does not apply to costs. Although a district court may, at its discretion, deny costs, this district court made no examination of the propriety of the amount claimed or of factors that a losing party may put forth in an effort to overcome the presumption in favor of costs. *See Singleton v. Smith*, 241 F.3d 534, 539 (6th Cir.2001) (listing relevant factors). These factors include "the losing party's good faith, the difficulty of the case, the winning party's behavior, and the necessity of costs." *Id.* The failure to consider these factors has been held to be an abuse of discretion. *Walker v. Roth*, 29 Fed.Appx. 239, 240, 2002 WL 169605 (6th Cir. Jan.31, 2002).

Here, the district court did not consider the issue at all, merely denying costs by applying a principle of Ohio law not applicable to costs. This was an abuse of discretion, and the denial of costs is vacated and remanded for further consideration.

## VII. Conclusion

For the reasons stated above, the judgment of the district court is AFFIRMED on all issues, except the judgment is VACATED and REMANDED on the issues of attorney fees and costs.