RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 13a0052p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

YELLOWBOOK INC.,

        *Plaintiff-Appellant,*

    *v.*

STEVEN M. BRANDEBERRY; AMERICAN
TELEPHONE DIRECTORIES, INC.,

        *Defendants-Appellees.*

No. 11-4267

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:10-cv-25—Thomas M. Rose, District Judge.

Argued: January 15, 2013

Decided and Filed: February 27, 2013

Before: BOGGS, ROGERS, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Bryce A. Lenox, THOMPSON HINE LLP, Cincinnati, Ohio, for Appellant. Darrell L. Heckman, HARRIS, MEYER, HECKMAN & DENKEWALTER, LLC, Urbana, Ohio, for Appellees. **ON BRIEF:** Bryce A. Lenox, THOMPSON HINE LLP, Cincinnati, Ohio, for Appellant. Darrell L. Heckman, HARRIS, MEYER, HECKMAN & DENKEWALTER, LLC, Urbana, Ohio, for Appellees.

_____

## OPINION

_____

BOGGS, Circuit Judge. This case involves a trademark dispute over the right to use the "AMTEL" name and marks for phonebooks in various Ohio counties. In 2002, Defendant Steven Brandeberry sold his phonebook business, operated under the name AMTEL, to Barney White, who in turn sold the business to Yellowbook, a national publisher of yellow-pages directories. In 2009, Brandeberry decided to start a rival

1

phonebook under the AMTEL name. Yellowbook brought this trademark-infringement suit; we must decide whether exclusive rights to AMTEL were transferred in the sale to White (and thus to Yellowbook). The district court found that when Brandeberry initially purchased the rights to the AMTEL mark the rights were transferred to both him individually and his corporation, American Telephone Directories, Inc. ("American Telephone"). The court then reasoned that since the sale to White did not involve Brandeberry in an individual capacity, Brandeberry retained his individual rights, and White received only a non-exclusive right to use the mark. Yellowbook argues that the contract should be read to have transferred the entire ownership of the mark and that in any case Brandeberry abandoned his right to the mark. However, the initial contract cannot be read to create joint ownership, and trademark law would not permit joint ownership under the facts in this case. As a result, the contract with White transferred exclusive ownership of the mark and, even if it did not, Brandeberry's rights were abandoned. Therefore, the judgment of the district court is reversed and remanded for grant of injunctive relief and determination of damages. In addition, the district court's decision to deny attorney's fees to Yellowbook is reversed and remanded for at least a partial grant of fees, because the deficiencies in Yellowbook's motion are not sufficiently egregious to warrant complete denial.

## I

### A. Brandeberry acquires the AM/TEL name

The trademark at issue in this case was originally created by Herb Burkhalter, who used the name "AM/TEL Directories" (a contraction of the corporate name "Area Marketing Telephone Directories") to publish a phonebook in Champaign County, Ohio. In 1994, Burkhalter approached Brandeberry about buying his business and they worked out a deal to sell the phonebook. The deal involved several contracts, including a "Corporate Asset Purchase Agreement," a covenant not to compete, and a "License Agreement." The "Corporate Asset Purchase Agreement" provided for the sale of the customer lists, sales records, and goodwill of Area Marketing Telephone Directories, in exchange for a down payment, monthly payments on a schedule, a share of revenues,

and various security pledges. Brandeberry signed the contract in his corporate capacity as president of American Telephone Directories, Inc., as a guarantor, and in his individual capacity. The "License Agreement" provided for the exclusive licensing of the name, insignia, and logo of AM/TEL, in exchange for $50,000. The agreement was made "by and between American Telephone Directories, Inc. and Steve M. Brandeberry (Licensee) and Herbert E. Burkhalter" and signed by Brandeberry as president and individually. Throughout the agreement, the singular term "licensee" is used to refer jointly to Brandeberry and American Telephone. Under the terms of the agreement, once all of the monthly payments were made, full ownership of the mark would be transferred to "licensee"; in case of default the license would expire. The agreement noted that the AM/TEL marks were not registered.

After the purchase, Brandeberry removed the slash from the AM/TEL name, marketing the directory as AMTEL. Brandeberry, through his corporation American Telephone, continued to market the Champaign County directory and expanded his business into three more counties by 2002. It does not appear he ever registered the AMTEL mark during this period.

### B. Brandeberry sells his business to White

In 2002, Brandeberry's phonebook business began to develop cash-flow problems, and he began negotiations with William "Barney" White, an Urbana businessman who had previously provided consulting services to American Telephone. Brandeberry drew up a "wish list" of terms for the sale, including a right to repurchase within 5 years, employment as executive Vice President of Sales and Marketing, and profit-sharing. White apparently agreed to some but not all of these provisions and had his lawyer draft three agreements: an asset-purchase agreement, a repurchase agreement, and an employment contract. The asset-purchase agreement was signed by Brandeberry and White, but allegedly White then refused to sign the other two agreements he had drafted. Brandeberry took White to court for this alleged "double crossing"; although Brandeberry claims he won this suit, there are no further details on the record and nothing to suggest that the asset-purchase agreement was invalidated or modified.

The asset-purchase agreement—the only contract signed, and the only contract on the record—provides in relevant part:

> Due to economic necessity, the Directors and Officers of **AM-TEL[1] DIRECTORIES, INC.** have voted to sell the assets of the business. . . . [I]t is hereby agreed by **AMTEL DIRECTORIES, INC.** and **P.B.J. WHITE DIRECTORIES, LLC.,** as follows:
>
> (1) **P.B.J. WHITE DIRECTORIES, LLC.** will acquire the assets, in their entirety, as set forth on the attached Exhibit "A", of **AM-TEL DIRECTORIES, INC.** and the right to use the name **AM-TEL DIRECTORIES** . . .
>
> > (a) The purchase price shall be **ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($100,000.00)** plus the assumption of the specified indebtedness . . . .

Exhibit "A" refers to a printout of American Telephone's balance sheet; one of the line items is a $50,000 entry labeled "Intan. Asset License Agrmnt," presumably referring to the trademark rights originally purchased from Burkhalter. After briefly reviewing the contract, Brandeberry signed the contract without any revisions, in his corporate capacity.

Initially, business continued as usual, with Brandeberry returning to work and White simply becoming the formal owner. But about a year later, White fired Brandeberry as a result of their continuing dispute about the unsigned repurchase agreement. The next month, White registered the AMTEL mark with the State of Ohio. White continued to market the four county directories, making some cosmetic changes to the AMTEL logo, and ultimately sold the business in its entirety to Yellowbook in 2007. It is undisputed that Yellowbook legitimately purchased all of the rights from White, and that Yellowbook continued to use the AMTEL mark in publishing its directories.

---

[1]The agreement incorrectly used the names "AM-TEL DIRECTORIES, INC." and "AMTEL DIRECTORIES, INC." to refer to American Telephone Directories, Inc.

### C. Brandeberry infringes and Yellowbook sues

In 2009, Brandeberry—having noticed that White's registration had expired in 2008 and was not renewed—registered the AMTEL mark for his corporation American Telephone. He then decided to "revive" the "original" AMTEL phonebook to compete with Yellowbook in Champaign County, sending letters to businesses to gauge interest and then actively soliciting customers. In 2010, Brandeberry and American Telephone published a competing phonebook, "The Original Champaign County Telephone Directory & Guide Book," using the AMTEL name and marks throughout.

Yellowbook filed suit against Brandeberry and American Telephone, alleging trademark infringement, interference with business relations, misappropriation of trade secrets, and unjust enrichment. Brandeberry counterclaimed for defamation. On summary judgment, the district court found for Brandeberry with respect to the trademark-infringement and tortious-interference claims against him personally and the trademark-infringement claim against his corporation. The district court reasoned that on the initial transfer of the AMTEL mark from Burkhalter both Brandeberry and American Telephone received rights to use the mark. As a result, American Telephone could not convey an exclusive right to White: Brandeberry retained his personal interest and Yellowbook could not prevent him from using the mark. Because Yellowbook did not have "the exclusive right" to use the AMTEL mark, the district court found that Yellowbook "cannot sustain a trademark infringement action against American Telephone either." Further, the district court rejected Yellowbook's abandonment argument, reasoning that abandonment can only be used as a defense to an infringement action, not to enforce rights against a senior user.

However, the district court found for Yellowbook with respect to tortious interference by Brandeberry's corporation, reasoning that since American Telephone had given up its right to use the AMTEL name, its interference with Yellowbook's business could not be justified. The question of damages for tortious interference went to trial, along with Brandeberry's defamation counterclaim; Yellowbook dropped its misappropriation and unjust-enrichment claims before trial.

The jury assessed $104,069 in compensatory damages and $10,406.90 in punitive damages against American Telephone for the tortious-interference claim, and awarded Brandeberry $10 in nominal damages for his defamation counterclaim.  Ohio law permits recovery of attorney's fees where punitive damages are awarded, and the jury found that Yellowbook was entitled to such fees.  Nevertheless, the district court declined to award Yellowbook fees, finding that the submitted request for $209,009.30 was not reasonable.  The district court found the request unreasonable because 1) Yellowbook's motion provided only a total dollar amount, not a grand total of the number of hours from the attached billing statement, 2) Yellowbook's lawyer kept time in quarter-hour increments, 3) an hourly rate of $345 to $360 for attorneys and $190 to $205 for paralegals was not reasonable for the Dayton legal market, and 4) there was no evidence Yellowbook actually paid the full amount billed.  In addition, the court found that if Yellowbook had met its burden of showing a reasonable number of hours and a reasonable rate, the total might have needed to be adjusted downward, based on Yellowbook's mixed success.

Yellowbook appeals, seeking reversal of the district court's denial of summary judgment on its trademark-infringement claims against Brandeberry and American Telephone, and an award of the full $209,009.30 in attorney's fees.

**II**

**A**

This court reviews de novo a district court's grant of summary judgment. *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 346 (6th Cir. 2012).  Summary judgment is appropriate where the record shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  All facts and inferences are viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment will be denied only where the record as a whole could lead a rational trier of fact to find for the nonmoving party. *Ibid*.  If supported by the record,

an appellate court may reverse summary judgment and enter judgment for the other party. *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 553 (6th Cir. 2005).

As the relevant question is what rights the Corporate Asset Purchase Agreement transferred from Brandeberry to White, we follow ordinary principles of contract interpretation, in light of the particular nature of trademark rights. Under Ohio law, contract interpretation is a matter of law subject to de novo review on appeal. *City of St. Marys v. Auglaize Cnty. Bd. of Commrs.*, 875 N.E.2d 561, 568 (Ohio 2007). The role of courts is to ascertain the intent of the parties, as shown by the plain language of the contract. *Id.* at 566. Only if the contract is ambiguous will courts look to facts outside the four corners of the contract to determine intent. *Savedoff v. Access Group, Inc.*, 524 F.3d 754, 763 (6th Cir. 2008). In determining ambiguity, courts construe the contract as a whole, giving reasonable effect to every provision. *Ibid.*

Under traditional principles of trademark law, "[t]here is no such thing as property in a trademark except as a right appurtenant to an established business or trade in connection with which the mark is employed." *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998); *see* Mark A. Lemley, *The Modern Lanham Act and the Death of Common Sense*, 108 Yale L.J. 1687, 1688 (1999) (criticizing the modern trend of treating trademarks "as things valuable in and of themselves, rather than for the product goodwill they embody"). Assignment of a trademark without its associated goodwill is treated as an invalid "assignment in gross" that gives the assignee no rights. *See* 15 U.S.C. § 1060; *In re Roman Cleanser Co. (Patterson Labs., Inc. v. Roman Cleanser Co.)*, 802 F.2d 207, 208 (6th Cir. 1986); *Greenlon Inc. of Cincinnati v. Greenlawn, Inc.*, 542 F. Supp. 890, 893 (S.D. Ohio 1982). As a corollary, ownership of trademarks impliedly passes with ownership of a business, without express language to the contrary. *Am. Dirigold Corp. v. Dirigold Metals Corp.*, 125 F.2d 446, 454 (6th Cir. 1942); *Plitt Theaters, Inc. v. Am. Nat'l Bank & Trust Co. of Chicago*, 697 F. Supp. 1031, 1034–35 (N.D. Ill. 1998). In order for the owner of a mark to retain the right to use the mark upon sale of the related business, 1) the intent to

resume "producing substantially the same product or service" must be manifest, 2) some portion of the prior goodwill must remain with the owner, and 3) operations must resume within a reasonable time. *Berni v. Int'l Gourmet Restaurants of Am., Inc.*, 838 F.2d 642, 647 (2d Cir. 1988). Otherwise, the owner is left with an unprotectable trademark "in gross." *Ibid.* Another consequence of the principle that trademarks are not independent of their related goodwill is that trademarks can be abandoned through mere non-use, as long as there is no intent to reuse. 15 U.S.C. § 1127. The use of the mark must be "bona fide" and not "merely to reserve a right in the mark." *Ibid.*

In this case, our analysis will proceed in two steps. First, we determine how the trademark rights were initially allocated when Brandeberry purchased the AMTEL phonebook from Burkhalter ("1994 License Agreement").[2] If we do not adopt Brandeberry's reading of the 1994 License Agreement, his main argument and the district-court opinion fall apart. Only then, once the initial rights allocation has been determined, do we proceed to interpretation of the contract between Brandeberry and White ("2002 Contract").

## B

The 1994 License Agreement provides that after payment in full, "licensee shall be the owner" of the AMTEL name. The contract uses "licensee" as shorthand to refer jointly to "American Telephone Directories, Inc. and Steve M. Brandeberry." Because of this—and because Brandeberry signed in both his corporate and individual capacity—the district court reasoned that the plain meaning of the contract assigned ownership rights of the mark to both Brandeberry and his corporation. Although the district court's reading is formally consistent with the language, such a reading is not compelled and is contrary to the reasonable intent of the parties as inferred from both the contract as a whole and the nature of trademarks.

---

[2]The district court noted below that "Yellow Book offers no argument regarding what entity or entities received the AM/TEL and AM/TEL Directories name, insignia and logo from Burkhalter," and this has not changed on appeal. Nevertheless, since addressing the 1994 License Agreement is an analytical necessity and Brandeberry presents this issue of law with "sufficient clarity and completeness," we will interpret the contract. *McFarland v. Henderson*, 307 F.3d 402, 407 (6th Cir. 2002).

The most basic problem with the district court's reading is that no part of the contract makes any mention of joint ownership. Brandeberry and his corporation are always collectively referred to as a singular "licensee." The contract gives no guidance as to whether the trademark rights would be owned jointly or as tenants in common, exclusively or non-exclusively, or be unilaterally assignable, transferrable, or licensable. We could speculate about how the parties intended to structure the joint ownership, but here the language permits a more straightforward interpretation. The natural reading is that the contract transferred a single right—undivided ownership—to Brandeberry's wholly owned corporation. As 100% owner of American Telephone, Brandeberry had no reason to retain any individual stake. Burkhalter made sure Brandeberry signed the contract in his individual capacity to hold him personally liable for the $50,000 purchase price of the trademark, not to bifurcate the property rights between Brandeberry and his corporation.

If the district court were correct that the contract created a joint right, this reasoning would apply with equal force to the 1994 Corporate Asset Purchase Agreement, which transferred various intangibles from Burkhalter to both Brandeberry and American Telephone, referred to jointly as "Purchaser." No party has argued that Brandeberry is also the joint owner of the AMTEL customer lists, books and records, and goodwill. All of these assets—as intended at the time—were held exclusively on the balance sheet of American Telephone, and we do not read the contract as creating a bifurcated ownership scheme where none was clearly intended or acted upon.

Joint ownership is disfavored in the trademark context. *See* 2 McCarthy on Trademarks & Unfair Competition § 16:40 (4th ed.). By their nature, trademarks derive their value from exclusively identifying a particular business. If customers are confused about which business the mark refers to, one of the users may unfairly benefit from the goodwill of the other, or the goodwill of the mark may be dissipated entirely. Beneficial joint ownership or licensing schemes may be devised, but courts are not well placed to fill in these details, and parties (and customers) are typically best served by exclusive ownership. It is not clear what benefits there would have been to splitting ownership

between Brandeberry and American Telephone.  Nor in practice did Brandeberry make any such attempts to bifurcate ownership.  He never used the AMTEL mark in his individual capacity or for other businesses, but simply through American Telephone and in his role as its President and employee.  Further, for any joint-ownership scheme to have been valid, Brandeberry would have to have received some of the AMTEL goodwill: otherwise his trademark rights would be "in gross" and invalid.  15 U.S.C. § 1060.  But the 1994 Corporate Asset Purchase Agreement appears to have transferred all of the goodwill and non-trademark assets to American Telephone, leaving it as the party presumptively holding the AMTEL mark.  Whether considered invalidated, abandoned, or not transferred in the first place, Brandeberry retained no rights in the AMTEL mark independent of his ownership of American Telephone.

## C

Given that Brandeberry did not retain any individual right to the AMTEL mark, our analysis of the 2002 Contract is simplified.  Brandeberry argues that the contract conveyed only a non-exclusive right to White.  He posits that since the contract does not include the term "exclusive," the phrase "right to use the name AM-TEL" must be interpreted as a non-exclusive right.  This position in not consistent, however, with the purpose and structure of the agreement.

First, when a business sells the "entirety" of its assets, the trade name is presumably one of these assets.  *Am. Dirigold*, 125 F.2d at 454.  A contract that sells "as an entirety the property of a corporation, including good will, passes title to the business trademarks of the corporation." *Ibid*.  A trademark is a placeholder for the accumulated goodwill of a business, which may be a significant part of the overall value.  The presumption is bolstered in this case by the specific inclusion of the trademark in the attached balance sheet, along with other goodwill intangibles.  This was not a sale to carve out a particular business or spin-off certain assets; it was a wholesale transfer from Brandeberry to White of control over American Telephone's entire business.  We will not presume the creation of jointly owned or non-exclusively licensed trademark rights,

especially where dissipation of goodwill, and increased customer confusion, is inevitable.

Second, the contract is not structured as an agreement to license or partially transfer the rights to the AMTEL mark.  The contract does not identify whether the right given to White is a license or some kind of joint ownership.  The contract does not put a time limit or any other conditions on exercising the right.  The contract does not forbid assignment or transfer or sub-licensing.  Instead, it provides for an unqualified right to use and assign—a grant indistinguishable from ownership.  Under trademark law, where a licensor does not exercise reasonable quality control over a licensee, the mark is deemed abandoned due to the "naked licensing." *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 764–65 (6th Cir. 2005); *see also Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959).  The minimum characteristics of a valid trademark-licensing agreement are absent from the 2002 Contract, so we will not construe the contract as an invalid naked license.

Brandeberry's resort to interpretive canons is of no avail.  Brandeberry argues that a specific provision (here, the "right to use" AMTEL) should control over the more general provision ("assets, in their entirety").  But "right to use" is best interpreted as a transfer of ownership.  At best, "right to use" is ambiguous, and then we should resort to the clarity of the general provision, which directly incorporates the balance sheet on which the AMTEL asset is listed.  Brandeberry also argues that the contract should be construed against the drafter.  To start, the "*contra proferentem*" canon is meant primarily for cases "where the written contract is standardized and between parties of unequal bargaining power." *Savedoff*, 524 F.3d at 764 (6th Cir. 2008).  This contract for sale of assets was not a nonnegotiable contract of adhesion, and Brandeberry is a sophisticated businessman.  Further, the "*contra proferentem* rule does not allow a court to adopt an unreasonable interpretation of the contract," or construe less-than-clear terms in implausible and harmful ways against the drafter. *Ibid.*  Here, it is not reasonable to construe the contract as creating some unclear, non-exclusive ownership right/license, instead of transferring American Telephone's entire business and its related trademarks.

Brandeberry also neglects another canon: that a contract is construed in the light that would sustain, rather than destroy it. *Duemer v. Duemer*, 88 N.E.2d 603, 611–12 (Ohio Ct. App. 1949). Brandeberry's suggested construction would destroy the trademark through its naked licensing, an outcome that would not "give effect to the intention of the parties." *Logsdon v. Fifth Third Bank of Toledo*, 654 N.E.2d 115, 119 (Ohio Ct. App. 1994).

As a final point, we should resist the use of corporate formalities of property ownership to effectively perpetrate fraud on buyers of businesses. Here, Brandeberry never represented that American Telephone did not have exclusive rights to the AMTEL mark, and White reasonably believed he would be getting the name free and clear. Since American Telephone *is* Brandeberry for practical purposes, we should treat the 2002 Contract as a transfer of not only American Telephone's assets, but also any of the interests supposedly jointly owned by Brandeberry individually.

### III

### A

Yellowbook also succeeds on its alternative argument. Even if we were to hold that Brandeberry acquired an individual right that he did not transfer in 2002, Brandeberry abandoned any such right over the next several years. Brandeberry argues, and the district court held, that abandonment may only be asserted as a defense. This misconceives the nature of abandonment, which is not simply an equitable principle like acquiescence or unclean hands that can only be used defensively against a specific party. *See* 15 U.S.C. § 1115(b)(9) (incorporating equitable defenses into the Lanham Act); *Elvis Presley Enters., Inc. v. Elvisly Yours, Inc*., 936 F.2d 889, 895 (6th Cir. 1991) ("Acquiescence focuses on a plaintiff's acts toward *the defendant*."); 6 McCarthy on Trademarks & Unfair Competition § 31:44 (4th ed.) ("Unclean hands, or trademark misuse, is purely an affirmative defense and does not form the basis for an affirmative claim for recovery."). Instead, abandonment is definitional in nature, setting limits on the scope of the trademark right. *See* 15 U.S.C. § 1127 (defining "abandoned"). It is

true that abandonment is often used defensively in infringement actions, 15 U.S.C. § 1115(b)(2), or preemptively in cancelling registrations, 15 U.S.C. § 1064(3). But to obtain registration of a mark in the first place, the registrant must swear that the mark has not been abandoned, 15 U.S.C. § 1058(b)(2)(B), and the Federal Trade Commission may independently apply to cancel the registration of abandoned marks, 15 U.S.C. § 1064. Abandoned marks may be registered by a new user, 15 U.S.C. § 1052(d), and such user has "right of priority, nationwide in effect . . . against any other person except for a person whose mark has not been abandoned." 15 U.S.C. § 1057(c). Given this statutory context, courts have uncritically applied abandonment principles in infringement suits against abandoning users. *Kellogg Co. v. Exxon Corp.*, 209 F.3d 562, 575–76 (6th Cir. 2000). Brandeberry's abandonment-as-defense-only position would permit trademark users who abandoned their rights impunity from charges of infringement, regardless of the official registration and legitimate use in commerce of later users. Such a rule would be anomalous.

**B**

Given that the issue of abandonment may be asserted offensively, the question remains whether Brandeberry abandoned his rights to the AMTEL mark. Although an abandonment claim involves factual issues, here it can be resolved on summary judgment, in favor of Yellowbook. To prove abandonment, a party must demonstrate both non-use and intent not to resume use. *Kellogg*, 209 F.3d at 575. Here, it is undisputed that Brandeberry did not use the AMTEL mark (and conversely that White did) from 2003 to 2009. This six-year period of non-use puts Brandeberry well beyond the three-year statutory presumption for abandonment. 15 U.S.C. § 1127. At this point, the burden shifts to Brandeberry to demonstrate intent to resume use. *Crash Dummy Movie, LLC v. Mattel, Inc.*, 601 F.3d 1387, 1391 (Fed. Cir. 2010). Brandeberry argues that his ongoing lawsuit with White—a suit in which he expected to win back control of the AMTEL business—excuses his failure to use the mark. First, there is only sparse evidence about the lawsuit in the record, and the district court should not deny summary judgment on such speculative grounds. Further, the existence of the lawsuit would not

have prevented Brandeberry from seeking a declaratory judgment concerning his rights in the AMTEL mark—especially urgent after White registered the mark for the first time in 2003. Instead, Brandeberry waited until White's registration expired to register it himself, apparently thinking that White had abandoned the rights. This is not enough to support an intent to resume use, and indeed suggests that Brandeberry thought White had the rights to the mark, at least until the registration expired.

## IV

Ohio law permits the recovery of attorney's fees if punitive damages are awarded, an exception to the general "American Rule" that each party bears its own attorney's fees. *Galmish v. Cicchini*, 734 N.E.2d 782, 795 (Ohio 2000). We review the district court's award of attorney's fees for abuse of discretion. *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 551 (6th Cir. 2008); *Bittner v. Tri-County Toyota, Inc.*, 569 N.E.2d 464, 467 (Ohio 1991). The party seeking attorney's fees "bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Dehoff v. Veterinary Hosp. Operations of Cent. Ohio, Inc.*, 2003-Ohio-3334, at ¶ 145 (Ct. App. 2011). The starting point is the "lodestar" amount, which is "the number of hours reasonably expended on the case times an hourly fee." *Unick v. Pro-Cision, Inc.*, 2011-Ohio-1342, at ¶ 27 (Ct. App. 2011). The fee amount may then be further adjusted to take into account the "results obtained," among other factors. *Bittner*, 569 N.E.2d at 466 (quoting *Hensley*, 461 U.S. at 434); Ohio Prof. Cond. Rule 1.5.

The district court found that neither the hours nor the rates submitted by Yellowbook were reasonable and denied fees completely. The court also noted that even if the hours and rates had been reasonable, a reduction of the award may have been warranted. We will address the district court's specific arguments in turn.

First, the district court found that Yellowbook had not met its burden of demonstrating reasonable hours because it provided only the total dollar value, not a total number of hours. The court declined to add up the individual line items on the billing sheet attached to the motion. The generally accepted practice is to reduce the fee

award by an appropriate percentage. *See Soler v. Evans*, 790 N.E.2d 365, 369 (Ohio Ct. App. 2003) (quoting *Hensley*, 461 U.S. at 434). Here, there is no suggestion that the attached documentation was insufficiently specific, only that Yellowbook failed to include the total number of hours in the motion. The total hours, however, can be calculated easily from the document, especially since Yellowbook already blacked out irrelevant billing entries. If the district court truly found the calculations unreasonably vague, it could have asked Yellowbook to supplement the motion with the numbers necessary. Where Yellowbook simply failed to "show its work" in calculating the lodestar, the district court abused its discretion in denying fees altogether.

Second, the district court found that Yellowbook's submission of time in quarter-hour increments was not reasonable. Whether quarter-hour billing is reasonable is a matter within the discretion of the district court. *See Bench Billboard Co. v. City of Toledo*, No. 11-3166, 2012 WL 3932775, at *9 (6th Cir. Sept. 10, 2012) (upholding 7.5% reduction for unreasonableness). However, as the concern with quarter-hour increments is over-billing, only fee reductions, not fee denials, are a proper exercise of discretion. Quarter-hour billing cannot mathematically warrant a fee reduction greater than 60% relative to tenth-of-an-hour billing, and in most cases district courts should apply much lower percentage reductions[3]—the purpose is to counter over-billing, not punish the failure to use tenth-of-an-hour billing.

Third, the district court found the hourly rates charged by Yellowbook's attorneys—$360 per hour for the lead attorney and $195 for paralegals—to be unreasonable. Courts calculate the reasonable hourly rate based on the "prevailing market rate in the relevant community" for lawyers of comparable skill and experience; out-of-town lawyers thus may only recover the rate they would command in the local market. *Sivit v. Vill. Green of Beachwood*, 2013-Ohio-103, at ¶ 71 (Ct. App. 2013) (citing *Blum v. Stenson*, 465 U.S. 886, 895 (1984)). The district court, consistent with

---

[3]A task of 6 minutes or fewer would result in billing 60% less under a tenth-of-an-hour system than under a quarter-hour system. An hour and one minute task, however, would only warrant a fee reduction of 12%, and lengthy or whole-hour tasks warrant little or no reduction. The bulk of Yellowbook's counsel's hours were incurred in multi-hour segments.

this standard, found that the market rate of a Cincinnati attorney was not reasonable in Dayton. However, because the court flatly denied fees and did not suggest what would have been a reasonable rate in Dayton, it is difficult for us to review the determination. On remand, the district court should indicate what a reasonable rate in Dayton for such litigation would be, provide some explanation for that conclusion, and reduce the fee award accordingly.

Fourth, the district court faulted Yellowbook for providing only the lawyer's time detail, not the amount actually paid by Yellowbook. This is a permissible consideration, and a court would not abuse its discretion in putting less weight on evidence of rates that have not necessarily been paid. *See United Ass'n of Journeymen & Apprentices of the Plumbing & Pipe Fitting Indus. v. Jack's Heating, Air Conditioning & Plumbing, Inc.*, 2013-Ohio-144, at ¶ 24 (Ct. App. 2013) ("Courts have recognized that merely submitting an attorney's itemized bill is insufficient to establish the reasonableness of the amount of work billed."). But requests for more documentation and percentage reductions will generally be the appropriate response, not flat denial.

Finally, the district court referred to the possibility of downward adjustment due to limited results. Such a reduction would not be an abuse of discretion, although here the analysis must be redone in light of the reversal of summary judgment. A downward adjustment might also be possible, as Brandeberry suggests, if the time spent by Yellowbook's lawyers was inordinate. *See Unick*, 2011-Ohio-1342, at ¶ 28 (quoting *Hensley*, 461 U.S. at 437) ("The hours worked should be necessary to the action and should not include 'hours that are excessive, redundant, or otherwise unnecessary.'") Our remand does not, moreover, preclude a denial of fees on discretionary grounds. Under Ohio law, the decision to award attorney's fees is discretionary; a trial court may decline to award attorney's fees if the court determines that punitive damages are adequate to compensate the plaintiff, punish the defendant, and deter similar conduct. *Regal Cinemas, Inc. v. W & M Props.*, 90 F. App'x 824, 834 (6th Cir. 2004) (citing *Digital & Analog Design Corp. v. N. Supply Co.*, 590 N.E.2d 737, 743 (Ohio 1992)). The court may exercise this discretion "even if a jury has determined that such fees

should be awarded." *Toole v. Cook*, No. 98AP-486, 1999 WL 280804, at \*9 (Ohio Ct. App. 1999).

**V**

For the foregoing reasons, the decision of the district court granting summary judgment for Brandeberry and denying summary judgment for Yellowbook is **REVERSED** and **REMANDED** for grant of appropriate injunctive relief and determination of damages for trademark infringement. As damages have already been assessed for tortious interference against American Telephone, additional compensatory damages may be duplicative, unless Brandeberry continues to infringe the AMTEL mark after judgment. The denial of attorney's fees is **REVERSED** and **REMANDED**.