# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20546

United States Court of Appeals
Fifth Circuit

**FILED**

January 12, 2018

Lyle W. Cayce
Clerk

WESTERN-SOUTHERN LIFE ASSURANCE COMPANY,

Plaintiff - Appellee Cross-Appellant

v.

GEORGE W. KALEH,

Defendant - Appellant Cross-Appellee

Appeals from the United States District Court
for the Southern District of Texas

Before REAVLEY, ELROD, and SOUTHWICK, Circuit Judges.

REAVLEY, Circuit Judge:

This case involves a lender who sued a guarantor for the breach of three personal guarantees. George Kaleh signed the guarantee agreements in conjunction with a real-estate-development project, and Western-Southern Life Assurance Company financed the project. After the borrowers defaulted on the underlying loans, Western foreclosed on the property and sued Kaleh.

The district court conducted a bench trial, found each claim timely, and awarded Western some but not all of its various forms of damages. Both Kaleh and Western appealed. After sorting through numerous issues, we vacate and remand for proceedings consistent with this opinion.

No. 16-20546

## I.   BACKGROUND

George Kaleh and Paul Buchanan (Texas residents) solicited Western-Southern Life Assurance Company (an Ohio resident) to finance the development of "the Meritage," a luxury apartment complex to be built in Houston, Texas. Kaleh and Buchanan formed three similarly-named entities for the purpose of borrowing funds: Sedona Apartments, LP; Sedona Apts GP, LLC; and Sedona Investors, L.P. The borrowing entities then secured two loans from Western. The parties segmented the loans in this manner to differentiate the interest rates—a lower interest rate for the less risky loan and a higher rate for the more risky loan.

First, Sedona Apartments, LP, which held title to the Meritage property, signed the Construction Loan Agreement and a corresponding promissory note (referred to collectively as the "Construction Loan") in exchange for $22,738,000. The parties secured the Construction Loan by a deed of trust for the Meritage property. Second, Sedona Apts GP, LLC and Sedona Investors, L.P. signed the Mezzanine Loan Agreement and a corresponding promissory note (referred to collectively as the "Mezzanine Loan") in exchange for $6,139,200. The collateral for the Mezzanine Loan is disputed, *see infra* § B.3, but the loan documents clarify the collateral was a pledge of 100% of the membership interest in Sedona Apts GP, LLC and 100% of the partnership interest in Sedona Investors, L.P, which together accounted for 100% of the equitable interest in Sedona Apartments, LP. The loan agreements each contained a Texas choice-of-law clause.[1]

Next, Kaleh signed three personal guarantees. First, Kaleh guaranteed the debt under the Construction Loan (the "Construction Guarantee"). Second,

---

[1] The parties later amended both loan agreements in ways immaterial to this dispute.

2

No. 16-20546

Kaleh guaranteed the debt under the Mezzanine Loan (the "Mezzanine Guarantee"). Both guarantees further obligated Kaleh's payment of (1) property insurance; (2) real estate taxes; (3) unremitted security deposits; and (4) attorney's fees incurred by Western. Finally, Kaleh guaranteed completion of the project (the "Completion Guarantee"), or more specifically, (1) completed construction of the Meritage; (2) payment of labor and service fees; (3) payment of budget overruns; (4) presentation of the Meritage without liens; and (5) payment of attorney's fees incurred by Western. Each guarantee contained an Ohio choice-of-law clause.

On April 16 and 17, 2009, Western sent the borrowers and Kaleh notices of default on the two loans, stating an intent to deem the notes due and payable if default went uncured. On August 11, 2009, Western delivered notice of acceleration of the debts. The following month, Western foreclosed on the membership interests secured by the Mezzanine Loan, purchased the interests, and took control of the property. Later, in December 2009, Western foreclosed on the Meritage itself and purchased the property for $18,000,000. Western then sought to complete construction of the Meritage and incurred various costs in doing so.

In June 2010, Western demanded payment from Kaleh. Three years later, on June 26, 2013, Western sued Kaleh for breach of the guarantees, claiming damages for the unpaid balance of the loans, post-foreclosure construction costs, settlement of construction liens, unpaid insurance premiums, unpaid property taxes, unremitted security deposits, and attorney's fees.[2] Western paid those attorney's fees to Baker Botts (for assisting in the

---

[2] For organizational purposes, this opinion will refer to Western's claims as (1) the Construction Guarantee claim; (2) the Mezzanine Guarantee claim; and (3) the Completion Guarantee claim.

3

foreclosure and lien settlements), Frost Brown & Todd (for assisting in the foreclosure and related Ohio litigation), and Vorys, Sater, Seymour, and Pease (for conducting the present litigation and appeal). The district court held a bench trial and issued findings of fact and conclusions of law.

The court held all three of Western's breach-of-guarantee claims were timely. The court then found liability on each claim and awarded Western $2,537,561.78 for the unpaid debt under the two loans (crediting the value of the property), and $1,306,177.44 for unpaid liens, property taxes, security deposits, and insurance premiums. But the court denied Western a vast majority of its $925,956 in attorney's fees[3] and all of its $619,981 in post-foreclosure construction costs.

Kaleh appealed, challenging the timeliness of Western's various claims. And Western cross-appealed, challenging the denial of its attorney's fees and post-foreclosure construction costs.

## II.    STANDARD OF REVIEW

In the wake of a bench trial, "findings of fact are reviewed for clear error and legal issues are reviewed *de novo*." *In re Mid-S. Towing Co.*, 418 F.3d 526, 531 (5th Cir. 2005). "A finding is clearly erroneous if it is without substantial evidence to support it, the court misinterpreted the effect of the evidence, or this court is convinced that the findings are against the preponderance of credible testimony." *Becker v. Tidewater, Inc.*, 586 F.3d 358, 365 (5th Cir. 2009).

This diversity case involves a couple of *Erie* guesses. "When making an *Erie* guess, [o]ur task is to attempt to predict state law, not to create or modify it." *SMI Owen Steel Co. v. Marsh USA, Inc.*, 520 F.3d 432, 442 (5th Cir. 2008)

---

[3] The court did, however, award Western $41,700 in appellate attorney's fees, a sum Kaleh does not challenge on appeal and that we leave undisturbed.

(alteration in original). We look first to cases from the relevant state's Supreme Court that, "while not deciding the issue, provide guidance as to how the [Court] would decide the question before us." *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel, L.L.C.*, 620 F.3d 558, 564 (5th Cir. 2010). And "we also consider those decisions of [the state's] appellate courts in determining how the [state] Supreme Court would rule on th[e] issue." *Id.* at 566.

## III.     DISCUSSION

### A.     The Governing Law

We must first stake out the governing law. Kaleh points to the underlying loan documents as mandating Texas law across the board, whereas Western offers the guarantees' Ohio choice-of-law clauses as the operative provisions. The district court forged its own path, applying Ohio substantive law and Texas procedural law. We agree with the district court.

In this diversity action, we look to Texas (the forum state) for the choice-of-law principles necessary "to determine which substantive law will apply." *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 770 (5th Cir. 2016). Texas will enforce a choice-of-law clause unless (1) "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or (2) the chosen law would be "contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of applicable law in the absence of an effective choice of law by the parties." *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324–25 (Tex. 2014) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2) (1971)). Neither side argues the choice-of-law clauses before us are unenforceable under the preceding rubric. Nor do the parties argue the clauses

No. 16-20546

are nullified by an irreconcilable conflict. Instead, we are left to pick between the two.

The Supreme Court of Texas has yet to face the specific question posed in this case, but we are nevertheless confident Texas law dictates that the guarantees' choice of law governs the substantive components of this lawsuit.[4] We start with a basic Texas principle: "A guaranty is a separate contract distinct from the primary obligation." *Ashcraft v. Lookadoo*, 952 S.W.2d 907, 913 (Tex. App. 1997). Kaleh offers no authority for deviating from that principle and disregarding the law of the guarantees (contracts he signed personally and which govern Western's lawsuit directly) in favor of the law of the loan documents (contracts he did not sign personally and which supply only the underlying liability). And, in fact, the intermediate Texas case to address this question head-on holds contrary to Kaleh's proposition. *See Georgetown*

---

[4] Although this court has not answered the precise question either, the topic is not unfamiliar. First, in *Resolution Trust Corp. v. Northpark Joint Venture*, 958 F.2d 1313, 1318–19 (5th Cir. 1992), this court applied the chosen law of the promissory note over the chosen law of the deed of trust. Some years later, in a more factually analogous breach-of-guarantee case, this court confronted divergent choice-of-law provisions in the deed of trust and guarantee agreements. *Int'l Interest, L.P. v. Hardy*, 448 F.3d 303, 307–308 (5th Cir. 2006). Instead of resolving that conflict, the *Hardy* panel certified the question to the Supreme Court of Texas. *Id.* But, before the Court could answer, the parties settled and we dismissed the appeal. Oddly enough, neither party mentions *Hardy*, let alone requests certification.

Though we are mindful of the *Hardy* panel's decision to certify the question, we do not feel the need to do so here. *Hardy*'s trepidation arose from the advent of TEX. PROP. CODE § 51.003, a 1993 anti-deficiency statute discussed in some detail below. *See infra* § B.1–3. Specifically, the *Hardy* panel was concerned that enforcing a generic choice-of-law clause to effectively waive section 51.003's substantive protections might be unenforceable as inconsistent with Texas policy. 448 F.3d at 308. Yet, neither party here argues the choice-of-law clauses are unenforceable in light of section 51.003. And, more importantly, the Supreme Court of Texas has since addressed waiver of section 51.003's substantive components, concluding that a party may waive its anti-deficiency protections with nothing more than a generic disclaimer of "any defense." *Moayedi v. Interstate 35/Chisam Rd.*, 438 S.W.3d 1, 3, 6–8 (Tex. 2014). In other words, section 51.003 no longer casts the same shadow over the viability of a choice-of-law clause, and the impetus for *Hardy*'s certification has since been alleviated.

*Assocs., Ltd. v. Home Fed. Sav. & Loan Ass'n*, 795 S.W.2d 252, 253–54 (Tex. App. 1990). There, the court applied the chosen law of the guarantee over a conflicting clause in the promissory note. *See id.* at 253 ("[T]he Guaranty on its face selects Texas law, and that choice should be respected. A plaintiff is entitled to sue on whatever obligation it chooses—here, the Guaranty."). Kaleh is thus bound by his guarantees, and Ohio substantive law governs.

Entirely separate, however, is the question of what procedural law to apply. Texas's rule is simple: "Even if a contract contains a choice-of-law provision in which the parties have agreed to apply the law of a different state, [Texas] as the forum will apply [its] own law to matters of remedy and procedure." *Man Indus. (India), Ltd. v. Midcontinent Express Pipeline, LLC*, 407 S.W.3d 342, 352 (Tex. App. 2013) (quoting *Autonation Direct.com, Inc. v. Thomas A Moorehead, Inc.*, 278 S.W.3d 470, 472 (Tex. App. 2009)). The district court was right to apply Texas procedural law.

## B.   The Timeliness of Western's Claims

We are tasked first with analyzing the timeliness of Western's claims. Texas procedural law in hand, we look for a Texas statute of limitations. The parties offer two candidates. The first is TEX. PROP. CODE § 51.003(a), which imposes a two-year limitations period:

> If the price at which real property is sold at a foreclosure sale under Section 51.002 is less than the unpaid balance of the indebtedness secured by the real property, resulting in a deficiency, any action brought to recover the deficiency must be brought within two years of the foreclosure sale and is governed by this section.

TEX. PROP. CODE § 51.003(a). And the second is TEX. CIV. PRAC. & REM. CODE § 16.004(a)(3), which contains a generic four-year limitations period: "A person must bring suit on [a debt] not later than four years after the day the cause of action accrues." TEX. CIV. PRAC. & REM. CODE. § 16.004(a)(3).

*1. Is section 51.003(a)'s two-year limitations period procedural or substantive?*

The district court recognized that Texas usually treats statutes of limitations as procedural devices. *Baker Hughes, Inc. v. Keco R. & D., Inc.*, 12 S.W.3d 1, 4 (Tex. 1999). But, with respect to section 51.003(a), the court applied a narrow caveat: when a statute creates both the right of action and the statute of limitations, Texas treats the limitations period as substantive. Concluding that "the two-year limitations period to sue on the deficiency is expressly contained within the subsection of the statute creating the right to sue to recover the deficiency," the court deemed section 51.003(a) substantive and thus inapplicable to Western's claims.

The court's recitation of Texas law was correct; Texas has long recognized that certain limitations periods are outside of the default procedural category. The exception emanates most prominently from *California v. Copus*, 309 S.W.2d 227, 231 (Tex. 1958). There, the Supreme Court of Texas explained, "where the statute creates a right and also incorporates a limitation upon the time within which the suit is to be brought, the limitation qualifies the right so that it becomes a part of the substantive law rather than procedural." *Id.* It continued, "[w]here by statute a right of action is given which did not exist by the common law, and the statute giving the right fixes the time within which the right may be enforced, the time so fixed becomes a limitation or condition on such right, and will control, no matter in what forum the action is brought." *Id.* (quoting 15 C.J.S. *Limitation of Actions* § 30).

We disagree, however, that the *Copus* exception applies to section 51.003(a). Contrary to the district court's characterization, section 51.003 does not create the right to sue to recover a deficiency—it creates no cause of action

8

at all. Texas courts have acknowledged as much, explaining that section 51.003 "does not *create* the right to bring an action for a deficiency; it merely regulates a right that apparently existed at common law," or in other words, section 51.003 "merely places a procedural limitation on a traditional common-law right of action." *Trunkhill Capital, Inc. v. Jansma*, 905 S.W.2d 464, 468 (Tex. App. 1995); *see also Colvest Mortg., Inc. v. Clark*, No. 05-95-00989-CV, 1996 WL 429300, at \*3 (Tex. App. July 23, 1996) (observing the same).

Western does little to rebut this truth and chooses to defend the district court's decision on a different theory: Section 51.003 creates a host of other substantive rights, and we should not excise the two-year limitations period from such a "substantive unified statutory scheme." Sure enough, section 51.003 creates several substantive rights. *See Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 6 (Tex. 2014). Among them, subsection (b) provides the defendant a right to request a fair-market-value determination, subsection (c) provides the defendant a right to offset against the deficiency, and subsection (d) credits insurance proceeds to the account of the borrower in certain situations. TEX. PROP. CODE. §§ 51.003(b)–(d).

But Western's reliance on the statute's creation of *any* substantive right fundamentally misunderstands *Copus*. The Supreme Court of Texas spoke not of any old right but of the right (the only right) a statute of limitations "qualifies"—the "right of action." *Copus*, 309 S.W.2d at 231. Section 51.003(a)'s limitations period qualifies the plaintiff's right to seek a deficiency judgment, a cause of action we have already established exists independent of the statutory scheme. But the limitations period in no way qualifies the defendant's right to assert offset or valuation defenses; the substantive and procedural matters exist independently, albeit under the same statutory roof.

9

Western's authority only serves to crystalize section 51.003(a)'s procedural nature. *See Chase Manhattan Bank v. Greenbriar N. Section II*, 835 S.W.2d 720, 727 (Tex. App. 1992); *Bank of Okla., N.A. v. Red Arrow Marina Sales & Serv., Inc.*, 224 P.3d 685, 696 (Okla. 2009). Both of these cases dealt with anti-deficiency statutes distinct from section 51.003. *Chase*, 835 S.W.2d at 727; *Red Arrow*, 224 P.3d at 689. And while both cases involved pre-suit time periods, the periods were not statutes of limitations at all but were instead "condition[s] precedent"—substantive elements of the respective deficiency claims. *Chase*, 835 S.W.2d at 724–25; *Red Arrow*, 224 P.3d at 696. To make matters even more clear, *Red Arrow* explained that the condition before it "differ[ed] vastly" from "an ordinary statute of limitations" because the latter "regulates merely the time for the commencement of an action." 224 P.3d at 696 n.38. Section 51.003(a) does exactly that by regulating the time in which an action "must be brought." TEX. PROP. CODE. § 51.003(a). It is therefore a quintessential statute of limitations within the ambit of default procedural characterization.

*2. Did Kaleh waive his section 51.003(a) statute-of-limitations defense?*

Having lost the substantive-versus-procedural battle, Western seeks to limit section 51.003(a)'s effective reach. Western claims first that Kaleh outright waived section 51.003(a) via the following language from each of the three guarantees:

> No setoff, counterclaim, reduction or diminution of any obligation, or any defense of any kind or nature, that Guarantor has or may have in the future against Borrower, or that Borrower has or may have in the future against Lender, will be available hereunder to Guarantor against Lender.

The district court rejected this argument, reading the above provision to waive only defenses the borrower may have against the lender, not those "that might

No. 16-20546

be independently available to the guarantor against the lender." That reading was unduly narrow given our decision in *LaSalle Bank National Association v. Sleutel*, 289 F.3d 837, 840–42 (5th Cir. 2002), in which we applied a similar provision to waive a guarantor's right to assert a defense directly against a lender. But the district court's ultimate conclusion stands. Assuming for the sake of argument that the scope of Kaleh's waiver was broad enough to capture limitations, it was void under Texas law. *Duncan v. Lisenby*, 912 S.W.2d 857, 858–59 (Tex. App. 1995) (explaining that "[a] general agreement in advance to waive" limitations is void and that the waiver "must be specific and for a pre-determined length of time" to be enforceable); *see also Titus v. Wells Fargo Bank & Union Trust Co.*, 134 F.2d 223, 224 (5th Cir. 1943). Kaleh did not waive his two-year limitations defense.

### 3. *What is the breadth of section 51.003(a)'s application?*

At this juncture, where section 51.003(a) is both procedural and not waived, Western acknowledges that its claim to recover the unpaid balance of the Construction Loan is governed by the two-year limitations period.[5] And there is no question Western filed its suit more than two years after its December 2009 foreclosure on the Meritage property. Western's claim to recover unpaid debt under the Construction Loan was therefore time-barred, and the district court erred in holding otherwise. *See* TEX. PROP. CODE § 51.003(a) (requiring suit "be brought within two years of the foreclosure sale").

---

[5] To the extent TEX. PROP. CODE § 51.003(a) and TEX. CIV. PRAC. & REM. CODE § 16.004(a)(3) both apply to the same claim, "the more specific time limit controls." *Valdez v. Hollenbeck*, 465 S.W.3d 217, 227 (Tex. 2015); *see also Sowell v. Int'l Interests, LP*, 416 S.W.3d 593, 599 (Tex. App. 2013) (applying section 51.003(a) over section 16.004(a)(3) when the two conflicted).

11

But Western suggests the effect of section 51.003(a) goes no further. This is so, Western says, because the two-year limitations period applies only to suits to recover "indebtedness secured by the real property." *Id.* And unlike the Construction Guarantee claim, Western continues, the Mezzanine and Completion Guarantee claims did not involve debt secured by real property.[6]

We agree with Western on this point. First, the Completion Guarantee involved neither debt nor collateral; it simply created a set of ongoing personal obligations related to the project's completion. Without a debt collateralized by real property, section 51.003(a) could not apply to Western's Completion Guarantee claim. *See Drieling v. Sec. State Bank & Trust*, No. 01-14-00257-CV, 2015 WL 1020212, at *3 (Tex. App. Mar. 5, 2015) (explaining that section 51.003(a) does not apply when the note is not collateralized by real property).

The Mezzanine Guarantee did, however, involve an underlying debt: the Mezzanine Loan. The precise identity of the Mezzanine Loan's collateral is hotly contested on appeal. Western argues the loan was secured not by real property but by a pledge of the ownership interest in the borrower entities. Kaleh counters that the loan was secured by the Meritage property itself and Western is "barred from arguing otherwise on appeal." Kaleh advances his quasi-estoppel argument by pointing to various instances in the record where Western referred to the Mezzanine Loan as "secured by a Deed of Trust" or "secured by the same collateral" as the Construction Loan. Western responds

---

[6] Western argues also that because section 51.003(a) applies only to claims for a "deficiency judgment"—that is, claims for the unpaid balance of the indebtedness—it is inapplicable to the remainder of Western's non-deficiency damages (for unpaid property taxes, security deposits, etc.) under the Construction Guarantee. Kaleh counters that all of these measures of damages were identified by the Construction Loan's deed of trust and thus covered by section 51.003(a). But, because the Mezzanine Guarantee independently guaranteed each of these measures of damage, and because we conclude section 51.003(a) does not apply to the Mezzanine Guarantee, we need not reach Western's argument or Kaleh's rebuttal.

in kind with its own citations to the record, where it clarified that the Mezzanine Loan was "secured separately . . . by the . . . member's interest in that borrowing entity" or "by a pledge of ownership interest in the borrowers."

At most, this quarrel indicates the parties referred to the Mezzanine Loan's collateral in an inconsistent, sometimes self-contradictory manner. In other words, the muddled record created a dispute about the collateral's true identity. But this is a dispute the parties already litigated and the district court already resolved when it concluded the Mezzanine Loan was secured not by real property but "by a pledge of the ownership interests the respective borrowers had in the Meritage." In so deciding, the court cited (and only cited) the language of the Mezzanine Loan documents themselves, which unambiguously identify the pledge of various membership interests as the relevant collateral.

Under Ohio law, the district court was on sure footing to rely on the language of the loan documents in lieu of the parties' extraneous characterizations. *See Aultman Hosp. Ass'n v. Comty. Mut. Ins. Co.*, 544 N.E.2d 920, 924 (Ohio 1989) ("[C]ourts will not give the contract a construction other than that which the plain language of the contract provides."). In turn, we do not find clear error, and we will not disturb the court's finding on appeal.

*4. Were Western's Mezzanine and Completion Guarantee claims timely?*

Because neither the Mezzanine Guarantee claim nor the Completion Guarantee claim sought to recover debt secured by real property, we withhold application of TEX. PROP. CODE § 51.003(a) and subject those claims to the generic four-year limitations period found in TEX. CIV. PRAC. & REM. CODE § 16.004(a)(3). In that respect, the district court found Western's claims timely. The court so held because it identified a timely accrual date of June 30, 2010, the day Western demanded payment from Kaleh.

On appeal, Kaleh offers no explanation for how the Completion Guarantee claim—which involved completion-related costs ostensibly incurred after Western took control of the Meritage property in September 2009—could have accrued more than four years prior to Western's June 2013 suit. Kaleh has therefore waived any challenge to the claim's timeliness under the four-year limitations period, and we affirm the court's timeliness finding in that respect. *See Am. States Ins. Co. v. Bailey*, 133 F.3d 363, 372 (5th Cir. 1998) ("Failure to provide any legal or factual analysis of an issue results in waiver.").

As for the Mezzanine Guarantee claim, however, Kaleh offers a specific, earlier accrual date: April 22, 2009, the day the borrowers failed to cure following a notice of default. If we were to accept this date, Western's claim to recover unpaid indebtedness under the Mezzanine Guarantee would be untimely.

We turn to the Texas accrual framework. In Texas, "[a] claim for breach of contract accrues when the contract is breached." *Cosgrove v. Cade*, 468 S.W.3d 32, 39 (Tex. 2015). More specific to the suit-on-a-debt context, "[i]f demand is an integral part of a cause of action or a condition precedent to the right to sue, the statute of limitations does not begin to run until demand is made, *unless demand is waived* or unreasonably delayed." *Wiman v. Tomaszewicz*, 877 S.W.2d 1, 5 (Tex. App. 1994) (emphasis added).

The question therefore becomes: did the Mezzanine Guarantee waive the need for demand? An examination of the "WAIVERS" provision in the guarantee itself answers the question in the affirmative: "[N]otice of default . . . demand for payment, notice of demand . . . are hereby waived." Western's citation to the word "demand" elsewhere in the guarantee does nothing to negate Kaleh's unequivocal waiver. As a result, the district court's demand-based June 2010 date was improper. *Wiman*, 877 S.W.2d at 5.

14

Even so, the district court acknowledged the possibility that Kaleh waived demand, and it bootstrapped its conclusion with an alternative accrual date: September 28, 2009, the day Western foreclosed on the Mezzanine Loan. The court picked this date because it held "the respective default on the underlying [Mezzanine] loan did not occur until the [September] foreclosure." But that premise is unsupported by the record; Western notified the borrowers on April 17, 2009 that the Mezzanine Loan "is now in default." It is only natural that the borrowers' default predated foreclosure because a lender has "no right to foreclosure" until the borrower defaults. *Roberts v. Burkett*, 802 S.W.2d 42, 46 n.3 (Tex. App. 1990). As a consequence, September 28, 2009 was similarly inapt as an accrual date.

Having disagreed with both of the district court's accrual dates, we confront a final timely alternative supplied by Western: August 11, 2009, the day Western delivered notice of acceleration of the debt. Western points us to the Texas framework summarized by *Boren v. United States National Bank Association*, 807 F.3d 99, 104 (5th Cir. 2015). There, we explained that when a promissory note "contains an optional acceleration clause . . . the action accrues when the holder actually exercises its option to accelerate." *Id.* (quoting *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex. 2001)). A lender must generally send two forms of notice to exercise this option: (1) "a notice of intent to accelerate" and (2) "a notice of acceleration." *Id.*

Western lobbies for affirmance under *Boren* because, though it sent a notice of default and intent to accelerate in April 2009, it did not effectuate the second prong of the equation until it sent the August 2009 notice of acceleration. While Western is correct that the Mezzanine Loan's promissory note contains an acceleration clause, Western neglects an important caveat to the *Boren* framework: a note maker can waive either of the default steps for

15

acceleration. *See Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 893–94 (Tex. 1991) ("[A] waiver of 'notice of intent to accelerate' is effective to waive that right," and "[w]aiver of 'demand' or 'presentment', and of 'notice' or 'notice of acceleration', in just so many words, is effective to waive presentment and notice of acceleration."). The parties' discussion of this particular waiver issue is minimal; Kaleh suggests offhand that the loan documents waived notice of acceleration, and Western leaves the issue entirely unaddressed. The answer to that question is naturally of great importance to picking between the April and August accrual dates, and it thus bears on the ultimate question of timeliness.

We decline, however, to pick between the two dates at this juncture because the district court never reached the waiver question. *See Stephens v. Witco Corp.*, 198 F.3d 539, 542–43 (5th Cir. 1999) (declining to affirm on an alternate legal theory when "questions of fact remain . . . that must be resolved before" the law could be applied). We therefore instruct the district court, on remand, to pass first judgment on the waiver question and to then evaluate the Mezzanine Guarantee claim's timeliness in light thereof.[7]

## C. Attorney's Fees

Having resolved Kaleh's appeal, we turn now to Western's cross-appeal. Western raises two issues: (1) whether the district court correctly denied the lion's share of Western's attorney's fees and (2) whether the district court correctly denied Western's post-foreclosure construction costs. We must

---

[7] We note further that because the district court found the Mezzanine Guarantee claim timely in all respects, it had no need to discern whether the non-loan liabilities stemming from the Mezzanine Guarantee (unpaid insurance, real estate taxes, and security deposits) should be subject to the same accrual date as the claim to recover the loan balance. Depending on the district court's answer to the waiver question, it is free to evaluate the issue for the first time on remand.

address each issue because both measures of damages are anchored on Western's Completion Guarantee claim, a claim we affirmed above as timely. *See* s*upra*, § B.4.

Applying Ohio substantive law, "the trial court['s] determination [on attorney's fees] should not be reversed absent a showing that the court abused its discretion." *Bittner v. Tri-County Toyota, Inc.*, 569 N.E.2d 464, 467 (Ohio 1991). At the same time, the trial court's "legal determination[s]" are subject to *de novo* review. *State ex rel. DiFranco v. City of S. Euclid*, 7 N.E.3d 1146, 1148 (Ohio 2014). The attorney's-fees issue here is two-pronged. Substantively, did Western's proof of fees suffice under Ohio law? And procedurally, should the district court have denied Western's request to prove up fees as "costs" at a post-trial hearing?

1. *Did Western's fee evidence suffice?*

We address first the sufficiency of Western's fee evidence. The *Erie* question largely boils down to this: Under Ohio law, must a fee claimant produce evidence of hours actually billed, rate actually charged, and work done, or may a claimant simply describe the task performed, offer the total bill incurred, and provide testimony that a reasonable rate and reasonable amount of hours would approximate the total? The district court found Ohio law requires the former, and because Western's evidence largely took the form of the latter, the court denied fees (save appellate fees). The Supreme Court of Ohio has yet to outline the threshold for proof of attorney's fees in this particular respect, so we are left to venture an *Erie* guess.

We begin with *Bittner*, in which the Supreme Court of Ohio solidified the state's acceptance of the lodestar method. 569 N.E.2d at 466. That is to say, Ohio determines "the amount of a reasonable fee" by examining "the number of hours reasonably expended on the litigation multiplied by a reasonable

hourly rate," subject to a host of modifying factors. *Id.* Although the *Bittner* Court did not go on to say whether the claimant must offer proof of hours worked and rate charged,[8] it did cite heavily from *Hensley v. Eckerhart*, 461 U.S. 424 (1939). *See Bittner*, 569 N.E.2d at 466–467 (citing *Hensley*, 461 U.S. at 424). *Hensley* contains, among other things, a command familiar to federal-law practitioners: "The party seeking an award of fees should submit evidence *supporting the hours worked and rates claimed*. Where the documentation of hours is inadequate, the district court may reduce the award accordingly." 461 U.S. at 433 (emphasis added). *Bittner* does not cite this specific proposition from *Hensley*, but its reliance on *Hensley*'s approach indicates to us that the Supreme Court of Ohio would likely accept the evidentiary principles therein.[9]

*Bittner* aside, our evaluation of Ohio intermediate caselaw brings us to the same conclusion. The parties rely principally on two divergent cases. First is *In re Estate of Wood*, 379 N.E.2d 256, 260 (Ohio Ct. App. 1977), in which an Ohio court upheld a fee award for an estate lawyer because the attorney "introduced sufficient evidence of the services performed and of the reasonable value of such services" and the court found no precedent "which would require an attorney to set forth the time he has expended." On the other side of the spectrum is *Unick v. Pro-Cision, Inc.*, No. 05CV1401, 2011 WL 1005429, at \*1, \*5, \*7 (Ohio Ct. App. Mar. 16, 2011), in which the fee claimant "failed to provide evidence of the rates or hours worked by his attorneys," and the court denied

---

[8] *Bittner* did, however, make specific note of the fact that the "attorneys submitted well-documented time reports detailing the amount of time they spent preparing for trial" along with "testimony regarding the number of hours worked and their hourly rates of recompense." 569 N.E.2d at 466.

[9] In fact, the Sixth Circuit has cited the proof-of-hours-and-rate requirement from *Hensley* when evaluating attorney's fees under Ohio law. *Yellowbook, Inc. v. Brandeberry*, 708 F.3d 837, 848 (6th Cir. 2013) (citing *Hensley*, 461 U.S. at 437).

fees because the claimant "b[ore] the burden of initially proving the number of hours an attorney spent on his case [and] the hourly rate that the attorney charges." (citing *Hensley*, 461 U.S. at 434); s*ee also Pracker v. Dolan*, No. 94-G-1867, 1995 WL 301455, at *4 (Ohio Ct. App. Apr. 21, 1995) (reversing a fee award when the claimant submitted only the total hours billed but not the hours spent for any particular service).

We conclude *Unick* more accurately represents Ohio's contemporary approach for two reasons. First, *Wood* predates the Supreme Court of Ohio's opinion in *Bittner* (and its corresponding reliance on *Hensley*). And second, in the relatively short time span since *Unick*, five other Ohio appellate courts— including the same one that authored *Wood*—have cited *Unick* for the very proposition at issue: proof of reasonable fees requires proof of work done, hours billed, and rate charged.[10]

In light of *Unick*, we do not find the district court's thorough review to be an abuse of discretion. With respect to fees paid to Baker Botts and Frost Brown & Todd, Western submitted only testimony of the service performed, the total invoice, and an estimate that a reasonable hypothetical rate and a reasonable number of hypothetical hours would approximate that total. Western's evidence left the district court to "speculate or surmise how much time was involved for related services," and ultimately, whether the fees actually incurred were reasonable. *Unick*, 2011 WL 1005429, at *4. Western's evidence with respect to fees owed to trial counsel, Vorys, Sater, Seymour, and

---

[10] *See Se. Land Dev., Ltd. v. Primrose Mgmt. L.L.C.*, 952 N.E.2d 563, 573–74 (Ohio Ct. App. 2011); *Arnett v. Bardonaro*, No. 25371, 2013 WL 1189009, at *11 (Ohio Ct. App. Mar. 22, 2013); *Columbus Truck & Equip. Co. v. L.O.G. Transp., Inc.*, No. 12AP-223, 2013 WL 3341175, at *4 (Ohio Ct. App. June 27, 2013); *Berryhill v. Khouri*, No. 100173, 2014 WL 6065684, at *6 (Ohio Ct. App. Nov. 13, 2014); *Kevin J. Kenney & Assocs., Ltd. v. Smith*, No. L-14-1146, 2015 WL 1510858, at *4 (Ohio Ct. App. Mar. 31, 2015).

Pease, was closer to sufficient, but it ultimately suffered from the same basic flaw. Western offered testimony of services performed, total fees incurred, rates of some of the lawyers who worked on the case (but not all of them), and total hours billed. But Western did not connect any of those components, meaning the court was again left to speculate what work was performed, at what rate, and for how many hours. That, too, was insufficient. *See Pracker*, 1995 WL 301455, at *4 (reversing fee award when the claimant submitted only total hours billed but did not provide hours spent for any particular service).

To conclude this issue, Western points out that the reason the district court awarded appellate fees was because those "fees have not yet been incurred, [and] the only evidence that could prove the reasonableness is expert testimony" in the form of a future estimate. As such, Western argues it is at the very least entitled to trial fees not yet incurred at the time its expert gave his estimates. However, assuming Ohio law permits proof of future fees by way of estimated hours and rates, we still affirm the district court's denial. This is so because Western's expert did not segregate his blanket "September 2015 to October 2015" estimate—which spanned both pre-trial work and estimated trial work—between those fees attributed to work already done (for which Western's proof did not satisfy the *Unick* rule) and work to be done in the future. As a consequence, the district court's denial of fees was not error.

*2. Is the court's decision to require proof of fees at trial reversible error?*

Western argues further that we must reverse and remand even if its initial proof of fees did not suffice. More specifically, Western contends Federal Rule of Civil Procedure 54 entitled it to prove up its fees post-trial, or in other words, that it should have been allowed to "supplement" its initial proof of fees with "additional evidence." Rule 54 provides in relevant part: "A claim for attorney's fees and related nontaxable expenses must be made by motion

unless the substantive law requires those fees to be proved at trial as an element of damages." FED. R. CIV. P. 54(d)(2)(A). The district court concluded Western's attorneys' fees sounded in "damages" under Ohio law and thus required proof of such fees at trial. Western disagrees, suggesting the fees are better characterized as "costs" under Ohio law.

Rule 54's damages-versus-costs distinction arises with relative infrequency in this circuit, but when it does, it typically involves a party who first moves for attorney's fees as costs after trial. *E.g.*, *Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035, 1037 (5th Cir. 2014); *Williams v. Wells Fargo Bank, N.A.*, 560 F. App'x 233, 245 (5th Cir. 2014) (per curiam). In that situation, when the district court erroneously classifies the fees as "damages" and denies the post-trial motion, it effectively deprives the fee-claimant of his or her only opportunity to prove attorney's fees, and we find reversible error. *Richardson*, 740 F.3d at 1040.

This case differs. The attorney's-fees issue surfaced early on, the district court placed Western on notice of the need to come forward at trial with evidence of attorney's fees, Western presented such evidence, and the court ruled on the sufficiency of that evidence. Western was neither deprived of the opportunity to prove up fees (like the claimant in *Richardson*) nor was Western required to makes its case to the incorrect fact-finder—in the bench-trial context, the court will evaluate fees either way. *See Circle Y Constr., Inc. v. WRH Realty Servs., Inc.*, 427 F. App'x 772, 777 (11th Cir. 2011) (per curiam) (finding no reversible error when a district court allowed a post-bench-trial Rule 54 motion because "the district court provided ample opportunity for both sides to present . . . their positions on the amount of fees that were due and to make a determination on the basis of that evidence"). Western received an opportunity to prove fees, and the proof it offered did not suffice. Thus, even if

the district court mischaracterized Western's fees as "damages" under Ohio law, we perceive no harm in the process the district court employed, and we will not reverse and remand.

## D. Post-Foreclosure Construction Costs

Finally, we evaluate whether Western was entitled to its post-foreclosure construction costs. The district court grounded its denial of those costs in three alternate holdings. We agree with the first and need go no further: the court held Western's failure to prove that its costs adhered to the project's "Plans and Specifications" foreclosed recovery. We review the legal component of that holding *de novo*. *See Long Beach Ass'n, Inc. v. Jones*, 697 N.E.2d 208, 209 (Ohio 1998) (characterizing contract construction as an issue of law).

In pertinent part, Kaleh agreed under the Completion Guarantee to indemnify Western for costs and expenses "incurred . . . because of . . . the Project [not being] fully completed in accordance with the Plans and Specifications and the other provisions of the Loan Agreement, including without limitation the requirements of Section 4.13 of the Loan Agreement, and in conformity with existing zoning and other laws, ordinances and regulations." Western contends the district court focused too narrowly on the "Plans and Specifications" phrase, and instead, the court should have permitted recovery under the "other provisions of the Loan Agreement" clause. Such "other provisions" cover things like damage or destruction, vandalism, and structural defects, to name a few. Western says its costs, regardless of whether they were tied to the "Plans and Specifications," fall into one of these other categories.

Yet, Western's reading misunderstands the structure of the guarantee. In the most basic sense, Kaleh agreed to ensure that the Meritage project was "completed." Phrased from the lender's perspective, Western was entitled to

recover costs incurred to make the project "complete." But what does "completion" mean? The above provision, awkwardly phrased as it may be, provides the definition; it explains that completion requires the conjunctive coalescence of several things: (1) satisfaction of the project's "Plans and Specifications" *and* (2) satisfaction of the "other provisions of the Loan agreement" *and* (3) satisfaction of other criteria not relevant here. *See Clagg v. Baycliffs Corp.*, 695 N.E.2d 728, 731 (Ohio 1998) (explaining that "the word 'and' is usually interpreted in the conjunctive").[11]

Viewed through that lens, Western's misstep becomes apparent. Western is indeed correct that costs incurred in remediating something covered by the "other provisions of the Loan agreement" could be recoverable. After all, a Meritage property with material damage, vandalism, or a structural defect is not "completed" under the terms of the guarantee. But, for Western to remediate the defect in a manner that completes the project, it must do so consistently (or, at least not inconsistently) with the remaining criteria for completion, including the project's "Plans and Specifications."

Think about it by way of example. Imagine the borrowers left the Meritage's pool house with vandalized ceiling lights and a cracked foundation, both defects presumably covered by the "other provisions." Imagine further that the project's plans called for a modest style of recessed lighting and a particular foundation with particular dimensions and a particular composition. Could Western then replace the lights with chandeliers, repair the foundation in a manner wholly inconsistent with the plans, and

---

[11] Ohio courts (like most courts) are "permitted to interpret" the word "and" in the disjunctive "if the sense requires it," that is, when it would be unreasonable to give the word its ordinary meaning. *Clagg*, 695 N.E.2d at 731. We, however, do not see the district court's interpretation as unreasonable.

nevertheless recover its costs from Kaleh? No—those repairs would not complete the property as Kaleh guaranteed it. In other words, Kaleh (in this hypothetical) guaranteed a completed pool house of a particular type, and though the defects entitled Western to repair them, the manner of repair was not without qualification.

It may very well be that Western conducted the bulk of its repairs and improvements in line with the project's plans. The problem was a lack of proof. In short, because there was no evidence that the post-foreclosure construction complied with the "Plans and Specifications," the district court was left to speculate as to whether that work in fact brought the project to contractual completeness. Without evidence of the plans and what they did (or did not) provide for, and with Western's damages witness unable to identify the source or original authenticity of the plans or to tie the incurred costs to them, Western simply failed to prove its entitlement to recovery. We therefore agree with the district court's interpretation of the contract, and we do not see its corresponding evaluation of the evidence as clearly erroneous.

## IV.    CONCLUSION

A summary of our decisions is as follows. First, the district court correctly identified the governing law. Second, the two-year limitations period in TEX. PROP. CODE § 51.003(a) is procedural and applies insofar as it bars Western's claim for recovery of unpaid debt under the Construction Loan. Third, the district court shall evaluate on remand whether the Mezzanine Loan's promissory note waived notice of acceleration, and in turn, shall examine the ultimate timeliness of the Mezzanine Guarantee claim and its constituent parts under the four-year limitations period. Fourth, we find the Completion Guarantee claim timely. Fifth, we uphold the district court's denial of Western's attorney's fees. And sixth, we uphold the district court's denial of

Western's post-foreclosure construction costs. It will be up to the district court to recalculate damages upon resolution of the remaining issues.

The judgment is vacated and the case is remanded for further proceedings consistent with this opinion.