# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**
February 13, 2019

Lyle W. Cayce
Clerk

No. 17-10574

MICHAEL WEASE,

> Plaintiff - Appellant

v.

OCWEN LOAN SERVICING, L.L.C.; WELLS FARGO BANK, N.A.,

> Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

ON PETITION FOR REHEARING

Before KING, HAYNES, and HIGGINSON, Circuit Judges.
STEPHEN A. HIGGINSON, Circuit Judge:

The petition for rehearing is DENIED. The court's prior opinion is withdrawn, and this opinion is substituted.

This Texas mortgage dispute presents contractual, statutory, and equitable issues. We discern ambiguity in the contract's escrow provisions and therefore hold that the district court erred by granting summary judgment to the defendants on claims arising from that ambiguity. Otherwise, we affirm.

## BACKGROUND

### I.  Factual

In 2003, Michael Wease executed a home equity note on his Texas property and secured the loan with a deed of trust. Wells Fargo Bank, N.A., is

the current beneficiary of the deed of trust and Ocwen Loan Servicing, L.L.C., the loan servicer.[1]

Among the promises the parties exchanged was the Escrow Waiver Agreement (the Waiver Agreement), which was appended to the deed of trust. It provided that the lender would "elect[] not to collect monthly escrow deposits to pay real estate taxes" subject to the condition that "[a]ll real estate taxes are paid when due, and evidence is furnished to Lender at that time." The Waiver Agreement warned:

> In the event Borrower fails to comply with [the] above condition[], Lender has the right and Borrower agrees to pay sufficient funds to establish a fully funded escrow account and to have the monthly payment adjusted to include a monthly escrow deposit.
>
> This action is an election not to collect escrows at this time and should not be deemed a waiver of Lender's right to do so at some future date.

Sections 3, 9, and 14 in the deed of trust also contained agreements about escrow. Section 3 explained when and how the lender could establish an escrow. It defined "Escrow Items" to include "taxes and assessments" and explained:

> If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

---

[1] Although both are named as defendants, we follow the parties' lead and refer to them collectively as "Ocwen."

Section 9 provided that if "Borrower fails to perform the covenants and agreements contained in this Security Instrument," then "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument." The section defined those actions to include, but not be limited to, "paying any sums secured by a lien which has priority over this Security Instrument."

Section 14 addressed notice. It required that all notices "given by Borrower or Lender in connection with this Security Agreement" be "in writing." It also provided that "[a]ny notice to Borrower . . . shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means."

For seven years, the arrangement functioned amicably. But in April 2010, Wease's loan servicer—then HomEq Servicing—sent Wease a letter advising him that HomEq had performed an "examination of past due property taxes" which revealed that Wease was "delinquent" on his taxes for the prior year (2009). The letter warned:

> The terms of your loan agreement require that you pay all taxes and assessments on your property when due. In accordance with the terms of your Mortgage/Deed of Trust, HomEq may advance funds to protect its interest in your property if this is not done. If HomEq advances funds to pay the delinquent property taxes, an escrow account will be established and will remain in effect for the remaining term of your loan. Your monthly payment will increase to reflect the escrow payment due.

The letter requested that Wease pay the taxes within 30 days of the date of the notice or, if he had already paid the taxes, that he forward proof of payment. Five days later, HomEq sent an identical letter. Wease did not pay his 2009 property taxes until June 30, 2010. The record does not indicate whether HomEq ever advanced or escrowed any money.

No. 17-10574

Six weeks later, Wease received a "Notice of Transfer" dated August 11, 2010. This letter informed him that Ocwen would replace HomEq as servicer. The terms of the financing agreement would remain in place. "If you are currently responsible for payment of your real estate taxes," the letter clarified, "you will continue to be responsible for payment of these items after your account transfers to Ocwen." Towards the end of the letter, Ocwen included a paragraph expressly concerning "Section 6 of RESPA (12 USC 2605)." The letter explained that the statute mandates servicers to acknowledge a "qualified written request" within 20 business days of receipt. Then the letter stated, "If you want to send a 'qualified written request' regarding the servicing of your loan, it must be sent to [an Orlando, FL] address[.]" At that time, Wease was current on his loan and tax payments.

On December 16, 2010—without prior notice—Ocwen paid Wease's 2010 property taxes. Unaware of Ocwen's payment, Wease paid his 2010 taxes in January 2011; the tax authorities subsequently refunded that amount. Six months later, on June 6, 2011, Ocwen sent Wease a letter labeled, "Annual Escrow Account Disclosure Statement Account History." It began by explaining: "This is a statement of actual and scheduled activity in your escrow account from August 2010 through July 2011." The statement did not mention, let alone expressly revoke, the Waiver Agreement. Instead, the letter asserted that Wease had a "total shortage for coming escrow period" worth $4,740.64, which Ocwen would collect "over 12 monthly payments" starting August 1, 2011. That would constitute an increase in Wease's monthly mortgage payment from approximately $700 to $1,355.88.

Wease defaulted in August 2011. He attempted to cure by sending partial payments in October and November, but Ocwen rejected them and, on January 3, 2012, sent a notice of default and intent to accelerate. On January 27, 2012, Wease sent his first of three alleged qualified written requests, or

4

No. 17-10574

QWRs, to a West Palm Beach, FL address. Wease's letter requested "all documentation concerning [his] loan including transaction history for the duration of the loan and any documentation proving who actually owns the property along with me." But Wease did not send this purported QWR to the exclusive QWR address in Orlando, FL.

The misaddressed letter nonetheless elicited a response from Ocwen on February 13, 2012, stating that Wease's partial payments were "insufficient to cure the default on the loan." The letter closed by telling Wease that he "may . . . send written correspondence" to the same West Palm Beach address where Wease had sent the letter—which, again, differed from the exclusive QWR address.

Wease sent two more alleged QWRs in the next few months, one to a Springfield, OH address and another via email. Neither went to Ocwen's exclusive QWR address listed in the notice of transfer and neither elicited an answer. Instead, in May 2012, Ocwen sent a notice of acceleration. Wease responded with this lawsuit.

## II.    Procedural

Wease originally filed suit in Texas state court and Ocwen removed to the Northern District of Texas. The operative complaint alleges, in relevant part: (1) breach of contract; (2) "equitable relief," i.e., a preemptive "unclean hands" defense to a potential foreclosure action; (3) violation of the Real Estate Settlement Procedures Act (RESPA); and (4) violation of the Texas Debt Collection Practices Act (TDCA). Ocwen filed a counterclaim for foreclosure. Ocwen prevailed entirely on its motion for summary judgment and Wease appealed.

## STANDARD OF REVIEW

We assess summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences

No. 17-10574

in the nonmovant's favor. *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013). The movant prevails by showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## ANALYSIS

### I.    Breach of Contract, Unclean Hands, and Foreclosure

Wease argues that Ocwen breached the deed of trust by paying Wease's 2010 taxes, starting to escrow, and increasing monthly mortgage payments— all without notice. Although "unclean hands" is "an affirmative defense," *Cantu v. Guerra Moore, LLP*, 448 S.W.3d 485, 496 (Tex. App.—San Antonio 2014, pet. denied), Wease's complaint invoked it as a "cause of action" to prevent Ocwen from foreclosing on his home. Ocwen's answer counterclaimed for foreclosure on the grounds that Wease breached the deed of trust and remains in default.

Texas substantive law governs the contract claims.[2] In Texas, breach of contract requires four elements: (1) a valid contract, (2) plaintiff's performance, (3) defendant's breach, and (4) resulting damages. *See Henning v. OneWest Bank FSB*, 405 S.W.3d 950, 969 (Tex. App.—Dallas 2013, no pet.). To determine the meaning of contractual terms, Texas courts focus on the parties' intentions as expressed in the contract itself. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333 (Tex. 2011). We must "examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless." *Id.* (quotation omitted). The starting point is the express language, *El Paso Field Servs., L.P. v. MasTec N. Am., Inc.*, 389 S.W.3d 802, 805–06 (Tex. 2012), which we will "strictly construe[]" when reading a deed of trust, *Bonilla v. Roberson*,

---

[2] The contract named Texas as its source of governing law. Applicable choice-of-law rules give effect to that clause. *W.–S. Life Assurance Co. v. Kaleh*, 879 F.3d 653, 658 (5th Cir. 2018).

6

No. 17-10574

918 S.W.2d 17, 23 (Tex. App.—Corpus Christi 1996, no writ). We will interpret those terms as a matter of law if they carry a "certain or definite legal meaning or interpretation." *El Paso*, 389 S.W.3d at 806. "[W]hether the contract is ambiguous is itself a question of law for the court to decide." *First Bank v. Brumitt*, 519 S.W.3d 95, 105 (Tex. 2017). If we find the contract ambiguous, its correct reading presents a jury question. *El Paso*, 389 S.W.3d at 806.

The first breach-of-contract question is whether the contract permitted Ocwen to pay Wease's non-delinquent 2010 taxes on December 16, 2010. The second issue is whether Ocwen provided contractually required notice of that action and of Ocwen's revocation of the Waiver Agreement.

Ocwen's strongest argument that the contract permitted Ocwen to pay Wease's 2010 taxes is Section 9's provision that Wease's "fail[ure] to perform the covenants and agreements contained in" the deed of trust permits the lender to "do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument." Ocwen reads that section to mean that when Wease failed to timely pay his 2009 taxes, Ocwen acquired the right to pay Wease's 2010 taxes, even though at the time Ocwen paid the 2010 taxes, Wease had already paid his 2009 taxes and the 2010 taxes were not yet delinquent.[3]

In addition to the fact-specific resolution called for by Section 9's "reasonable or appropriate" provision, Ocwen faces a problem under Section 3,

---

[3] The 2010 tax lien attached on January 1, 2010. *See* Tex. Tax Code § 32.01(a) (emphasis added) ("On January 1 of each year, a tax lien attaches to property to secure the payment of all taxes, penalties, and interest *ultimately imposed for the year* on the property . . . ."). However, Wease's taxes would not have become delinquent until February 1, 2011. *See* Tex. Tax Code § 31.02(a) ("[T]axes are due on receipt of the tax bill and are delinquent if not paid before February 1 of the year following the year in which imposed."). Ocwen has not presented evidence suggesting that the taxing authority would attempt to foreclose on the property after the taxes became "due" but over a month before they became "delinquent." Therefore, there remains a factual dispute as to whether it was "reasonable or appropriate" for Ocwen to pay Wease's tax bill prior to delinquency.

which provides: "If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay *the amount due* for an Escrow *Item*, Lender may exercise its rights under Section 9 and pay *such amount . . . . .* " (emphasis added). Section 3 uses the singular, backward-looking "amount due" and permits the lender to pay "such amount." Under that interpretation, the contract would have permitted Ocwen only to pay Wease's past-due 2009 taxes—not to pre-pay his 2010 taxes.[4] To be sure, Section 3 also states that Ocwen "may revoke the [escrow] waiver as to any or all Escrow Items *at any time . . . .*"[5] A strong reading of that clause would suggest that Ocwen might have the right to pay taxes preemptively without a triggering condition.[6]

A contract is ambiguous if it "is subject to two or more reasonable interpretations." *Nat'l Union Fire Ins. Co. of Pitt., PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). Given the two plausible readings above, the deed of trust is ambiguous. And because ambiguity precludes summary judgment, *El Paso*, 389 S.W.3d at 806, Wease was entitled to proceed to trial on his claim that Ocwen breached the contract by paying his 2010 taxes before they became delinquent.

The second breach-of-contract issue is whether Ocwen failed to provide adequate notice of its actions. Section 3 provides that "Lender may revoke the [escrow] waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 14." Section 14 simply requires that a notice be given "in writing" and delivered to the borrower. The record reflects, and Ocwen acknowledged at oral argument, that Ocwen did not provide notice that it

---

[4] By the time Ocwen took over the loan from HomeEq, Wease had already paid his 2009 taxes.

[5] The crucial end of that sentence—"by a notice given in accordance with Section 14"— is explained below.

[6] The record is unclear as to whether and, if so, how Ocwen ever revoked the Waiver Agreement.

would begin collecting taxes through an escrow account until June 6, 2011. But the record is also clear that Ocwen had paid Wease's 2010 taxes *six months before that notice was sent*. Indeed, the June letter informed Wease that his (presumably already-existent) escrow account had a shortage of $4,740.64, which Ocwen would collect over the following twelve-month period. With these facts in the record, it was error for the district to conclude as a matter of law that Ocwen had provided contractually adequate notice of its revocation of the Waiver Agreement.[7]

The district court rejected Wease's unclean hands argument and granted summary judgment on Ocwen's foreclosure counterclaim based on the reasoning that Ocwen's actions "concerning the payment of taxes, implementing an escrow account, and pursuing foreclosure, were proper." As set forth above, there is a factual question as to whether Ocwen's actions breached the contract; however, unclean hands is only a defense to a request for equitable relief. We therefore affirm the district court's summary judgment for Ocwen on Wease's unclean hands "cause of action" (a mislabeled affirmative defense). Contrastingly, foreclosure is a contractual remedy. Our breach-of-contract holding here does not mean that Ocwen is barred from recovery of money that may be owed on the property, or eventual foreclosure—but we highlight that the foreclosure remedy would only be available if Ocwen shows that it complied with contractual requirements. At this stage, it is premature to conclude that Ocwen is entitled to summary judgment on its foreclosure

---

[7] Ocwen maintains that it had no obligation at all to provide notice of revocation of the Waiver Agreement. But at oral argument, Ocwen contended that if such notice were required, the June letter sufficed to put Wease on notice of actions that Ocwen had taken in the past—namely, paying Wease's 2010 taxes and opening the escrow account. As Ocwen's counsel candidly put it, "The notice was sent in June but the action was taken in [the previous] December."

No. 17-10574

counterclaim. We therefore vacate the foreclosure ruling and remand for reconsideration.

## II.    Real Estate Settlement Procedures Act (RESPA)

RESPA is a consumer protection statute that, in relevant part, obligates a covered loan servicer to respond to a borrower's qualified written requests (QWRs). 12 U.S.C. § 2605(e). A QWR is a written request "for information relating to the servicing of [a] loan." *Id.* § 2605(e)(1)(A). When a borrower sends a QWR, the loan servicer must, among other actions, return "a written response acknowledging receipt of the correspondence." *Id.* § 2605(e)(2)(A)–(C). Pursuant to § 2605(f), a borrower can sue a servicer who fails to reply as required.

Federal regulation permits servicers to "establish a separate and exclusive office and address for the receipt and handling of" QWRs. 24 C.F.R. § 3500.21(e)(1) (repealed 2014).[8] "[If] the servicer establishes such an office and complies with all the necessary notice provisions of this rule, then

---

[8] RESPA originally authorized the Department of Housing and Urban Development (HUD) "to prescribe such rules and regulations" and "make such interpretations . . . as may be necessary to achieve [the statute's] purposes." 12 U.S.C. § 2617 (repealed 2011). With that authority, HUD issued the cited regulation. The Dodd-Frank Act transferred HUD's rulemaking authority over RESPA to the Consumer Financial Protection Bureau (CFPB). *See* Pub. L. No. 111–203, § 1098, 124 Stat. 1376, 2104 (2010). Thus, in June 2014, HUD rescinded its version of the regulation. *See* Removal of Regulations Transferred to the Consumer Financial Protection Bureau, 79 Fed. Reg. 34,224, 34,224–25 (June 16, 2014), 2014 WL 2637011. The CFPB promulgated a new regulation resembling the one that HUD had established. *See* 12 C.F.R. § 1024.36(b) ("A servicer may, by written notice provided to a borrower, establish an address that a borrower *must* use to request information in accordance with the procedures in this section." (emphasis added)); *see also id.* § 1024.35(c) ("If a servicer designates a specific address for receiving notices of error, the servicer shall designate the same address for receiving information requests pursuant to § 1024.36(b)."). We apply HUD's regulation because Wease's letters predate the CFPB's regulation. Neither party has urged that HUD's regulation is inapplicable. Moreover, at least three other circuits have applied HUD's regulation to events occurring before the CFPB issued its new guidance. *See Bivens v. Bank of Am., N.A.*, 868 F.3d 915, 919–21 (11th Cir. 2017); *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181–83 (2d Cir. 2014); *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1143, 1147–50 (10th Cir. 2013).

the borrower must deliver its request to that office in order for the inquiry to be a 'qualified written request.'" Real Estate Settlement Procedures Act, Section 6, Transfer of Servicing of Mortgage Loans, 59 Fed. Reg. 65,442, 65,446 (Dec. 19, 1994), 1994 WL 702481.

Ignoring an exclusive QWR address carries harsh consequences. Circuit courts consistently conclude that a loan servicer need not answer a misaddressed QWR—and that responding to such a letter does not trigger RESPA duties—if the servicer set an exclusive address. *See, e.g.*, *Bivens v. Bank of Am., N.A.*, 868 F.3d 915, 921 (11th Cir. 2017) ("Because [the borrower] failed to address his QWR to [the servicer]'s designated address for QWR receipt, [the servicer] had no duty to respond to it."); *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 182 (2d Cir. 2014) ("As long as a servicer complies with the notice requirements of 24 C.F.R. § 3500.21 for designating a QWR address, a letter sent to a different address is not a QWR, even if an employee at that address . . . in fact responds to that letter."); *Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1149 (10th Cir. 2013) ("Communication failing to meet the requirements of RESPA and its implementing regulation amounts to nothing more than general correspondence between a borrower and servicer. Receipt at the designated address is necessary to trigger RESPA duties . . . .").[9] Our court has followed that approach. *See Steele v. Green Tree Servicing, LLC*, No. 3:09-CV-0603-D, 2010 WL 3565415, at *3 (N.D. Tex. Sept. 7, 2010) ("Because . . . Green Tree established an exclusive location at which it would accept [QWRs], and . . . the Steeles never sent a proper request to that address, Green Tree had no duty under RESPA to respond . . . ."), *aff'd*, 453 F. App'x 473, at *1 (5th Cir. 2011) ("We affirm for essentially the reasons stated by the district court.").

---

[9] While *Roth* and *Berneike* applied *Chevron* deference, *Bivens* employed *Auer* deference. That distinction is not at issue here.

No. 17-10574

In line with these authorities, the district court granted Ocwen summary judgment on the RESPA claim because Wease neglected to send his letters to Ocwen's exclusive QWR address.[10]

On appeal, Wease makes two arguments for the first time: (1) even if Ocwen designated an exclusive QWR address, the company subsequently provided a different QWR address on every monthly statement, and (2) Ocwen changed its exclusive address either through letters to Wease or when an Ocwen employee verbally gave Wease a different address. "It is well settled in this Circuit that the scope of appellate review on a summary judgment order is limited to matters presented to the district court." *Keelan v. Majesco Software, Inc.*, 407 F.3d 332, 339 (5th Cir. 2005). "We will consider an issue raised for the first time on appeal . . . if it is a purely legal one and if consideration is necessary to avoid a miscarriage of justice." *Langhoff Props., LLC v. BP Prods. N. Am. Inc.*, 519 F.3d 256, 261 n.12 (5th Cir. 2008). Wease's new arguments mix fact and law, and their consideration is not necessary to avoid a miscarriage of justice. Accordingly, we affirm the district court's grant of summary judgment in Ocwen's favor on the RESPA claim.

## III.    Texas Debt Collection Practices Act (TDCPA)

Wease's complaint alleged that Ocwen violated the TDCA, Texas Finance Code §§ 392.001 *et seq.*, by, among other actions, calling Wease's home and leaving "numerous harassing messages." When Ocwen moved for summary judgment on the TDCA claim, Wease's opposition focused exclusively on the other actions. Accordingly, the district court properly concluded that

---

[10] Wease puzzlingly avers that Ocwen did not designate an exclusive QWR address. That argument plainly fails. Under 24 C.F.R. § 3500.21(e)(1), a servicer may "establish a separate and exclusive office and address for the receipt and handling of qualified written requests" through a "Notice of Transfer." In a document entitled "Notice of Service Transfer (RESPA)," Ocwen wrote: "If you want to send a 'qualified written request' regarding the servicing of your loan, it *must* be sent to this address . . . ."

"Wease elected not to address his TDCA claim based on Ocwen's alleged harassing phone calls" and therefore deemed that claim "abandoned."[11]

On appeal, Wease contends that his opposition to summary judgment included reference to his "sworn [d]eclaration that detailed Ocwen's harassing phone calls and messages." But "[i]t is not our function to scour the record in search of evidence to defeat a motion for summary judgment; we rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies." *Buehler v. City of Austin/Austin Police Dept.*, 824 F.3d 548, 555 n.7 (5th Cir. 2016) (quotation omitted). A brief's stray reference to a fact—with no explanation of its import—fails to defeat a summary judgment motion. The district court did not err.

Wease also argues that the district court improperly granted summary judgment because Ocwen never met its initial burden under *Celotex Corp v. Catrett*, 477 U.S. 317 (1986), to show the absence of a genuine issue for trial. That argument reflects a misunderstanding of the summary judgment standard. A movant for summary judgment need not set forth evidence when the nonmovant bears the burden of persuasion at trial. By urging otherwise, Wease would resuscitate the rule that prompted certiorari in *Celotex* and was therein rejected. *See id.* at 323 ("[U]nlike the [D.C.] Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim.") (emphasis in original).

Indeed, our court has squarely rejected this argument. In *Stahl v. Novartis Pharmaceuticals Corp.*, the plaintiff-appellant protested that the trial court "improperly placed the summary judgment burden on him, the non-

---

[11] The district court granted Ocwen summary judgment on all of Wease's TDCA claims, including those unrelated to phone calls. On appeal, Wease does not seek to revive his other theories of TDCA liability.

moving party, without first requiring [the defendant] to come forward with documentary proof of the absence of a genuine issue of material fact regarding [the plaintiff]'s claim." 283 F.3d 254, 263 (5th Cir. 2002). We explained that "Stahl misread[] both Rule 56 and the *Celotex* decision. . . . The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Id.*

Here, Ocwen relied on Wease's pleadings and pointed out gaps in the record to demonstrate its entitlement to summary judgment on the TDCA claim. The district court then properly shifted the burden to Wease and found that he failed to carry it.

## CONCLUSION

We REVERSE summary judgment on the breach-of-contract claim and VACATE and REMAND for reconsideration of the foreclosure counterclaim. On all other claims, we AFFIRM.